**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **DEVERY DAVIS and CLIFTON HUMPHREY, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,** | § § § § § | **CIVIL ACTION NO. 4:20-cv-00724** |
| **Plaintiffs** | § § | |
| **v.** | § § | |
| **FIVE OAKS ACHIEVEMENT CENTER, LLC d/b/a FIVE OAKS ACHIEVEMENT CENTERS; WHISPERING HILLS ACHIEVEMENT CENTER, LLC d/b/a WHISPERING HILLS ACHIEVEMENT CENTER; and NORTH FORK EDUCATIONAL CENTER, LLC d/b/a NORTH FORK EDUCATIONAL CENTER** | § § § § § § § § § § | **COLLECTIVE ACTION** |
| **Defendants.** | | |

**MOTION AND BRIEF FOR SUMMARY JUDGMENT**

Defendants Five Oaks Achievement Center, LLC d/b/a Five Oaks Achievement Centers, Whispering Hills Achievement Center, LLC d/b/a Whispering Hills Achievement Center, and North Fork Educational Center, LLC d/b/a North Fork Educational Center move for summary judgment that Plaintiffs and the consent parties take nothing, and in support of this motion show as follows:

**SUMMARY**

Plaintiffs are former employees in Defendants' residential treatment centers for abused and neglected children. Their job duties required them to sleep on site during four-day work shifts. They were paid for all hours worked outside of their designated sleep times, and for any sleep time that was interrupted by a call to duty. Plaintiffs allege that Defendants did not meet FLSA

requirements for providing adequate sleep facilities, and that the deduction of sleep time was not legally permitted or accurately recorded.  They seek back wages and liquidated damages.

Defendants move for summary judgment that Plaintiffs take nothing.  By this motion they show that Defendants' sleep facilities met the minimum FLSA requirements, deductions for sleep time were authorized under the FLSA and applicable regulations, and Plaintiffs were properly paid for all hours they actually worked including any interruptions in sleep time caused by a call to duty, which each Plaintiff reported on mandatory reporting forms.  Defendants also show that they implemented their practice of deducting sleep time in reliance on advice of counsel, rendering the alleged violations not willful and causing the FLSA's two year statute of limitations to apply and bar most claims.  Finally, Defendants show that they reasonably and in good faith believed that their pay practices fully complied with the FLSA, so Plaintiffs are not entitled to liquidated damages in any event.

## UNDISPUTED FACTS

1.      Defendants operate highly regulated residential treatment centers for abused and neglected children including some with special needs.  Patients include "intense" and "intense psychiatric" minors who may engage in violence against each other as well as sexual abuse.  Direct Care Staff (DCS) employees must be on site and ready to respond instantly.  Exhibit 1 (Declaration of Roxann Voyles) ¶ 3.

2.      Plaintiffs and the consent parties are former DCS employees.  Pursuant to their Agreements on Hours Worked, Plaintiffs worked 96 hour work shifts, 4 days-on and 4 days-off, and slept on site during their work shifts between 10 p.m. and 6 a.m., but did not live on site or sleep on site outside of their 96 hour work shifts.  Pursuant to applicable regulations (29 CFR 785.22), and as agreed to in their Agreement on Hours Worked, Defendants deducted up to 8 hours sleep time per day from DCS employees' total work hours per shift.  On a normal shift, therefore,

Plaintiffs were paid for 16 hours per day during each work week, 40 hours at regular pay and time and a half for any hours over 40. *Id. at* ¶ 4 and Ex. A thereto.

3.      Defendants provided adequate sleeping accommodations for DCS employees and employed additional Night Awake employees who were on duty during the designated sleep periods for DCS employees from 10 p.m. to 6 a.m.. Each DCS employee also acknowledged in their Agreement on Hours Worked that they were provided with sleeping facilities adequate to get a reasonable night's sleep. In November 2016, employees at Five Oaks and North Fork were provided with tented beds for sleeping in privacy. Each facility has a locked storage area accessible only to the staff, allowing them to safely store their personal property. There is a Staff-only bathroom, to which the clients have no access. There is a full kitchen, with food in the refrigerator and pantry. The homes are heated and air conditioned and are safe. Defendants also incurred significant expenditures on pest control services to ensure, as best as they could, for a pest-free environment. *Id. at* ¶ 5. *See also* Ex. 2 at Ex. A thereto (Expert Report of Randall G. O'Neal) pp. 14-16 (hereafter referred to as "O'Neal Report").

4.      In accordance with the FLSA and advice of legal counsel, Defendants provided a designated 8 hour sleeping period, during which plaintiffs were usually able to get an uninterrupted night's sleep. Defendant deducted 8 hours of sleep time from DCS employees' total work hours for each 24-hour day of their 96-hour work shift. However, if a DCS employee was awakened during their sleep time to take care of a child or had to cover for a night shift employee during sleep time, they were required to document such extra work, first by turning in a mandatory Incident Report and, second, by adding the time to their time sheet or obtaining an Employee Time Correction Request, and Plaintiffs were paid for all additional working hours they reported. If a DCS employee did not get 5 hours of uninterrupted time off during their designated sleep period they were paid for the entire 24-hour period. Plaintiffs were advised of the pay system upon hire

and agreed to it in written Agreements on Hours Worked.  Voyles Decl. ¶ 6 and Ex. A thereto.  *See also* O'Neal Report pp. 18-24.

5.      DCS employees like the Plaintiffs are required to turn in Daily Progress Reports and Incident Reports accounting for the activity, behavior, interaction/intervention with and comments on each resident including any Incidents occurring during sleep periods.  The reports had to be submitted by DCS employees by 9 a.m. the following day.  Employees were also responsible for the adequacy of their own timesheets, or were required to clock in and out of work using Five Oaks' time clocks, and had to sign and affirm that all of their reported hours were true and correct.  Five Oaks started using electronic time clocks in 2016.  Any additional work hours had to be submitted on Employee Time Correction Reports.  Voyles Decl. ¶ 7.

6.      Each plaintiff regularly submitted the mandatory Incident Reports showing the time of all Incidents with patients, and regularly submitted the mandatory Employee Time Correction Requests showing any added work hours, and they were paid for all reported hours.  *Id. at* ¶¶ 8-9 and Exhibits B and C thereto; O'Neal Report pp. 20-24.

7.      Defendants' business records show that Plaintiffs actually reported any added work hours during designated sleep times, either due to an Incident Report during sleep times or due to hours they worked for one of the night shift, all as stated on Employee Time Correction Reports.  Reported Incidents were rare between the hours of 10 p.m. and 6 a.m.  The records demonstrate that Plaintiffs knew how to document, and did document, whenever they had added work hours during their designated sleep times.  Voyles Decl. ¶¶ 9-10.

8.      Defendants' business records do not include any evidence that any plaintiff or consent party suffered a sleep interruption due to a call to duty for which they were not paid.  There is an *absence of evidence* in the business records that any plaintiff or consent party was not paid for a sleep interruption resulting from a call to duty or from filling in for a night shift employee.

*See* Rule 803(7) Fed. R. Evid. (absence of evidence in a business record).  If any plaintiffs' sleep time was interrupted by a call to duty which they did not report on these required forms, then Defendants would have no way of knowing that there had been additional hours worked during designated sleep times.  *Id. at* ¶ 11.

9.     On May 14, 2018, the pay structure for DCS employees was revised and the 8-hour sleep time deduction was eliminated. Thereafter, employees were paid for 24 hours for each day they were on shift even if they were sleeping.  *Id. at* ¶ 12.

10.    A qualified expert on FLSA matters inspected Defendants' sleep facilities and time recording procedures and found that Defendants provided adequate sleeping facilities for Plaintiffs which complied with FLSA standards under the relevant regulations and as interpreted by the Wage and Hour Division of the U.S. Department of Labor.  He further found that Defendants had policies and procedures which would result in the accurate recording of hours worked by Plaintiffs. And he further found that Defendants met the FLSA requirements for deducting designated sleep time from the calculation of hours worked.  O'Neal Report pp. 2, 3, 12-23.

## ASSERTED CLAIMS AND DEFENSES

11.    Plaintiffs assert FLSA overtime claims based on the deduction of their designated sleep time from their hours worked.   Their claims center on (a) whether their sleep accommodations met FLSA standards and (b) whether their sleep time was interrupted by calls to work which were not paid for.  None of their claims are supported by documentation.  Complaint (Dkt. 1) ¶¶ 18-23.

12.    In particular, in their discovery responses the named Plaintiffs describe their specific complaints as follows:

> INTERROGATORY NO. 2: Please identify with specificity each instance in which you allege that any Defendant violated the Fair Labor Standards Act, describing each instance in detail.

[objection omitted] In addition to the disclosure responses, Plaintiffs and Consent Parties respond as follows:

Devery Davis: I worked a weekly rotation working 4 days on 4 days off. Early on I would sleep in my truck because there was no privacy from the residents. Later, I brought my own supplies of sheets and folding bed to sleep on. Eventually we got beds like tents, but we still had to do paperwork at night sometimes. Also, the residents would go to the kitchen in the middle of the night or the restroom, which would wake me up. On many occasions, the boys may get into fights, and try to escape. We would consistently have to go search for them. My sleep was always interrupted.

Clifton Humphrey: I was employed approximately 6 years, we worked weekly rotations as 4 days on and 4 days off. On my shifts, we slept out in the opening on the sofa where the residents had unfettered direct access to me and other staff. We were interrupted by doors being opened consistently, lights consistently being turned on, and boys trying to run away from the facility in the middle of the night. We also had to intervene because the one female night staff person could not keep up with the boys. Other behavior issues with the residents caused my sleep to be interrupted.

Ex. 3 (Plaintiffs and Consent-Parties' Objections and Answers to Defendant Five Oaks Achievement Center, LLC's Interrogatories) at Interrogatory No. 2.

13.    Defendants deny Plaintiffs' claims and assert that Defendants' sleep facilities met the minimum FLSA requirements, deductions for sleep time were authorized under the FLSA and applicable regulations, and Plaintiffs were properly paid for all hours they actually worked including any interruptions in sleep time caused by a call to duty. Defendants also assert that they implemented their practice of deducting sleep time in reliance on advice of counsel, rendering the alleged violations not willful and causing the FLSA's two year statute of limitations to apply and bar most claims. Finally, Defendants assert that they, reasonably and in good faith, believed that their pay practices fully complied with the FLSA, so Plaintiffs are not entitled to liquidated damages in any event.

14.    Defendants seek summary judgment with regard to the following issues:

1. Plaintiffs were usually able to enjoy an uninterrupted night's sleep as defined in the regulations.

2. Plaintiffs entered into both express and implied agreements to the deduction of sleep time.

3. Defendants provided adequate sleeping facilities to DCS, including Plaintiffs.

4. Defendants' payroll and timekeeping system, including forms and policies, was adequate to record all hours worked by DCS, and to pay for all hours worked, including overtime at time and a half of the employees' regular rates of pay for hours worked in excess of 40 in any workweek, and in fact Plaintiffs were paid for all hours worked.

5. Defendants implemented their practice of deducting sleep time in reliance on advice of counsel. Any alleged violations with regard to this practice were consequently not willful, and the FLSA's two-year statute of limitations is applicable.

6. Defendants reasonably and in good faith believed that their pay practices fully complied with the FLSA. Plaintiffs are therefore not entitled to liquidated damages, even if back wages are found due.

## ARGUMENT AND AUTHORITIES

### Deductions for Sleep Time under the DOL's Regulations

15.     There is no dispute among the parties over the requirement that all hours worked by the Defendants' Direct Care Staff be recorded and paid for.   Where, as here, employees are on duty for 24 hours or more, the applicable regulation (29 CFR 785.22) allows their employers to deduct up to 8 hours of sleep time, provided certain conditions are met.

### Direct Care Staff under 29 CFR 785.22

16.     The Defendants' Direct Care Staff are governed by the regulations referenced in 29 CFR 785.22.  The complete provisions of 785.22 are as follows:

(a) General. Where an employee is required to be on duty for 24 hours or more, the employer and the employee may agree to exclude bona fide meal periods and a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked, provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep. If sleeping period is of more than 8 hours, only 8 hours will be credited. Where no expressed or implied agreement to the contrary is present, the 8 hours of sleeping time and lunch periods constitute hours worked.

(b) Interruptions of sleep. If the sleeping period is interrupted by a call to duty, the interruption must be counted as hours worked. If the period is interrupted to such an extent that the employee cannot get a reasonable night's sleep, the entire period

must be counted. For enforcement purposes, the Divisions have adopted the rule that if the employee cannot get at least 5 hours' sleep during the scheduled period the entire time is working time.

17.     In this case, the Defendants' Direct Care Staff are typically on duty for four consecutive 24-hour shifts, followed by four days off.   A typical shift for a Direct Care Staff member is from 6:00 am one day to 6:00 am the next.   The period from 10:00 pm to 6:00 am is a bona fide regularly scheduled sleeping period of not more than 8 hours.   Voyles Decl. ¶ 4. Plaintiffs do not contest the fact that members of the Defendants' Direct Care Staff are on duty for 24 hours.

18.     Under 29 CFR 785.22, there are three separate and discrete conditions under which employers may deduct sleep time from hours worked for employees on 24-hour duty—the employees, must usually enjoy an uninterrupted night's sleep, must agree to such deductions, and must be provided adequate sleeping facilities.

**Issue No. 1: Plaintiffs Usually Enjoyed an Uninterrupted Night's Sleep**

19.     If an employee on duty for 24 hours or more usually enjoys an uninterrupted night's sleep, the employer may deduct sleep time from hours worked. According to the DOL Field Operations Handbook ("FOH") Section 31b12(c)(2): "An employee can 'usually enjoy an uninterrupted night's sleep' if an employer's interruptions that prevent him or her from getting 5 consecutive, uninterrupted hours of sleep occur less than half the time. Interruptions to an employee's 5 consecutive hours of sleep that occur during half or more than half of an employee's shifts are too frequent to meet this requirement."   A copy of the FOH is available online at www.dol.gov/sites/dolgov/files/WHD/legacy/FOH_Ch31.pdf.

20.     A review of the Defendants' time and payroll records show that in the vast majority of workweeks, there were few records of any interruptions during the designated sleeping period whatsoever, and even fewer instances of interruptions lasting more than three hours (meaning the

employee in question received less than five hours of uninterrupted sleep). Voyles Decl. ¶¶ 8-11. *See also* O'Neal Report pp. 20-24.

21.     Plaintiffs assert that their sleep was disturbed by various things including residents going to the kitchen, doors being opened, and lights being turned on by residents.  However, both the regulation and case law make it clear, that only when employees are awakened by a "call to duty" is the interruption considered to be hours worked:

> As to an employee who is on duty for 24 hours or more or a live-in employee, **any interruption by a <u>call to duty</u> of what might otherwise be properly excluded sleep time must be treated as hours worked**. *See* 29 CFR 785.22(b)

(emphasis added). FOH 31b12(e)(1)  Such interruptions would be considered in determining how many hours of sleep could be deducted, as well as whether sleep time could be deducted at all.  It should be noted that if at some point in his employment Davis slept in his truck as he claimed, this would defeat the purpose of DCS being on duty 24 hours per day. He would be unable to respond quickly to any emergencies.

22.     In the instant case, the Direct Care Staff usually sleep in a living room or common area.  If a Direct Care Staff member is a light sleeper, she may be awakened by various noises in the night. This, however, is not the sort of interruption that would be considered in determining how many hours of sleep could be deducted, as well as whether sleep time could be deducted at all. Such interruptions are not calls to duty, which are clearly the only sort of interruption contemplated by the regulation.  So the claims by Davis and Humphrey that "residents would go to the kitchen in the middle of the night or the restroom, which would wake me up" and "We were interrupted by doors being opened consistently, lights consistently being turned on…." do not describe interruptions by calls to duty; rather, the noises they complain of are not unlike those in many homes in many communities—*see Beaston v. Scotland School for Veterans' Children*, 693 F. Supp. 234 (M.D. Pa. 1988), *aff'd mem.*, 869 F.2d 587 (3rd Cir. 1989), discussed further below.

23.     The adequacy of sleeping facilities is sometimes conflated with the issue of interruptions. While these two issues however are conceptually distinct, in practice, they may overlap.  In the case cited below, while court tended to conflate the adequacy of sleep with interruptions of sleep, the case is of particular importance because it is exactly on point when it comes to sleep interruptions for reasons other than a call to duty:

> The plaintiffs contend that the sleeping facilities provided by the school are inadequate in that they are unable to obtain normal rest during the uncompensated periods of sleeping time. Complaints at trial concerned noises from students, the heating system, passing trains and security guards. Depending upon the cottage, its location on the campus and the sleeping habits of the individual houseparents, the intrusiveness of the disturbances varied. Some houseparents didn't hear noises. Of the plaintiffs who were disturbed by noises, some testified they would remain awake for long periods while others went back to sleep immediately.
>
> The variations in testimony reveal the personal factors involved in an inquiry into the adequacy of sleeping facilities. There is no doubt that the houseparents' sleep is temporarily disturbed on occasion. However, upon consideration of all of the evidence, *the court is unable to conclude that the plaintiffs are furnished inadequate sleeping facilities or that they are unable to get normal rest. The noises they complain of are not unlike those in many homes in many communities.*

*Beaston v. Scotland School for Veterans' Children*, 693 F. Supp. 234 (M.D. Pa. 1988), *aff'd mem.*, 869 F.2d 587 (3rd Cir. 1989) (emphasis added).

24.     In the instant case, it is clear that interruptions by calls to duty are not so frequent, or so long in duration, as to preclude deductions for sleep time. *See e.g.*, Voyles Decl. ¶ 10; also O'Neal Report pp. 20-24.  The regulation allows such deductions if the employees in question are able to get at least five hours of sleep. This means that for the sleep time deduction to be disallowed, Direct Care Staff members would have to be called to duty during the night for more than 3 hours, cumulatively.  The regulations permit a maximum of 8 hours sleep time to be deducted, meaning a minimum of 5 hours of sleep is required. The difference is 3 hours, meaning that if 3 or fewer hours of call to duty interruptions occur, the minimum threshold is still met and a sleep deduction is still permitted. And the 5 hours need not be continuous, as the Fifth Circuit has recognized:

...Department of Labor (DOL) regulations allow unpaid sleep periods during duty shifts exceeding twenty-four hours so long as adequate facilities are provided and the employee can get at least five hours' sleep during the scheduled period. 29 C.F.R. § 785.22(b) (2005). The DOL has clarified that the five hours of sleep need not be five continuous uninterrupted hours of sleep.

*Depriest v. River West LP*, 187 Fed. Appx. 403 (5th Cir. 2006) (internal citation omitted).

25.     Thus, if Direct Care Staff members get at least 5 hours of sleep uninterrupted by calls to duty, then Defendants would be justified in deducting at least 5 hours from the 24 hours which make up their shifts.

**Issue No. 2: Agreement between the Employer and the Employee**

26.     The second condition that employers must meet in order to deduct sleep time from hours worked for employees on 24-hour duty is when the employer and the employee themselves enter into an agreement, express or implied, to exclude a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked.  *See e.g.*, 29 CFR 785.22(b).

27.     Plaintiffs don't deny their agreement.  In this case, there is an express agreement called an "Agreement on Hours Worked" between many of the Direct Care Staff members and Defendants concerning excluded sleep time.   Voyles Decl. ¶ 4; O'Neal Report pp. 13-14.   It appears that all Plaintiffs signed such an Agreement.

28.     The regulations also allow for an "implied agreement." Where, as here, employees are aware of the arrangements, agree to be employed, and continue to work and accept pay under the arrangements, many courts, including various Circuit Courts of Appeal, have found the requisite implied agreement:

> We agree with the district court both that an agreement to exempt sleep time from paid work under the FLSA can be implied, and that the undisputed facts in this case compel the conclusion that there was an implied agreement to do so. Although it is clear from the record and appellants' pleadings that they became unhappy with the policy sometime after beginning their employment with Tobosa, it is equally clear that appellants understood and acquiesced to the policy when they were hired.

*See Ariens v. Olin Mathieson Chem. Corp.*, 382 F.2d 192, 197 (6th Cir. 1967) (holding implied agreement existed where employees were informed of and acquiesced to working schedules exempting sleep time and accepted pay checks based on those schedules). Accord, *Braziel v. Tobosa Developmental Servs.*, 166 F.3d 1061 (10th Cir. 1999)

29.     Both the Sixth and Tenth Circuit Courts of Appeal have explicitly accepted that "where employees were informed of and acquiesced to working schedules exempting sleep time and accepted pay checks based on those schedules" an implied agreement existed. This is precisely the situation in this case.   O'Neal Report pp. 13-14.

30.     So, whether there was an express agreement signed by Plaintiffs, or an agreement implied by the circumstances, or both, all of the Plaintiffs agreed to exclude sleep time from hours worked. There is nothing in the record to suggest that Plaintiffs deny the existence of such express or implied agreements.

**Issue No. 3: Adequacy of Sleeping Facilities**

31.     The Wage and Hour Division has never promulgated any definite standard as to what constitutes adequate sleeping facilities.  *See* O'Neal Report pp. 16-17.   At least part of the reason for this omission is that such determinations must be made on an individualized basis, balancing the sleep of employees with the needs of the employer to take into account the realities and demands of the job – including the need for employees to be on site and to assure that they remain quickly available for duty.

32.     As Defendants' expert has noted, facilities equal to or even worse than those of Defendants are deemed fully adequate. The only objective issues Plaintiffs have raised with regard to adequacy of the Defendants' sleeping facilities in this litigation is that the employees slept on mattresses on the floor (actually, many Direct Care Staff put their mattresses on furniture or counters to be off the floor—see O'Neal Report p. 15), and the presence of pests such as insects.

Plaintiffs have pointed to no regulation or opinion letter suggesting that mattresses on the floor are inadequate in general, nor have they presented any cases in which a court took that position, nor have Defendants found any such case law or regulatory declaration to that effect. The same is true with regard to pests. The record demonstrates that Defendants have made substantial efforts and expenditures to maintain their premises in a pest-free condition. Voyles Decl. ¶5.  It is also noteworthy that in their Interrogatory responses, supra, Davis admits that "[e]ventually we got beds like tents," and Humphrey admits that he "slept out in the opening on the sofa…."  The "beds like tents" to which Davis refers were twin beds with tent-like coverings, and they were purchased on or about November 9, 2016. *Id.*. This is well before the beginning of the longest possible statute of limitations. Both the sofa and the tented beds are adequate for sleeping. O'Neal Report pp. 14-17.

33.    The most significant fact is that that the vast majority of Direct Care Staff did in fact sleep. This is really as far as the analysis needs to be taken.  O'Neal Report p. 14.

**Relationship Between Adequacy of Sleeping Facilities and Need for Employees to Respond**

34.    Nothing in 785.22, or in the opinion letters, or even in the applicable case law, requires private quarters in a home-like environment as a condition to deducting sleep time from employees who, like DCS in this case, are on duty for 24 hours or more. Far less is required, and the adequacy of facilities must be evaluated in terms of the necessity for employees to respond quickly to calls to duty:

> Further, the question of adequacy must be determined in the context of what FLSA and its regulations seek to accomplish. The FLSA regulation at issue is clearly not designed to ensure employees are well-rested -- five hours of sleep, even if consecutive, does not usually leave a person fully refreshed. Rather, the regulation is meant to strike a fair balance between a 24-hour shift employee's desire to be compensated for all hours spent on the job, and the employer's desire to avoid paying employees for hours spent sleeping. See generally 29 U.S.C. § 202 (setting out the policies behind FLSA). The regulation sets forth the "fair balance:" Put simply, the employer can avoid paying the employee for no more than 8 hours spent actually sleeping, and if the employee doesn't get a total of 5 hours of sleep, the

employer must pay the employee for all hours worked. **Similarly, an assessment of the adequacy of the sleeping facilities must strike a fair balance between the employee's desire for a quiet and private sleep chamber, and the employer's need to take into account the realities and demands of the job -- including the need to house employees on site and to assure that they remain quickly available for duty.** Thus, just as it would be impractical to provide large, private bedrooms to flight crews while in the air, it would be unrealistic to shield emergency personnel from all station-house interruptions without also risking delays in employee response time. "Adequate" sleeping facilities may thus require more than a chair in a corner of an office, but may also be less than a home-like atmosphere. (emphasis added).

*Trocheck v. Pellin Emergency Med. Serv., Inc.*, 61 F. Supp. 2d 685 (N.D. Ohio 1999).

35.     There are several very significant points made in *Trocheck*. First, the Court clearly states that "'[a]dequate' sleeping facilities may thus require more than a chair in a corner of an office, but may also be less than a home-like atmosphere." *Id*.

36.     Second, the Court reminded us that certain balances must be struck in evaluating the adequacy of sleeping facilities under section 785.22. These include a "balance between a 24-hour shift employee's desire to be compensated for all hours spent on the job, and the employer's desire to avoid paying employees for hours spent sleeping" as well as "a fair balance between the employee's desire for a quiet and private sleep chamber, and the employer's need to take into account the realities and demands of the job – including the need to house employees on site and to assure that they remain quickly available for duty." *Id*.

37.     Here, the Defendants operate facilities for "intense" and "intense psychiatric" minor patients. These minors can engage in violence against each other, as well as sexual abuse, and the Direct Care Staff members must be on site and ready to respond instantly. Voyles Decl. ¶ 3.

38.     Finally, the primary point the *Trocheck* Court makes quite clear is that "[t]he FLSA regulation at issue is clearly not designed to ensure employees are well-rested…." The paramount

concern is to meet the emergency needs of the patients, even while allowing the employees to get some sleep.

39.      The U.S. Department of Labor's Wage and Hour Division has accepted as adequate sleeping facilities under section 29 CFR 785.22 certain facilities that are very far removed from private quarters. In one Administrator's Opinion Letter, for instance, the agency accepted wilderness camping conditions as adequate sleeping facilities:

> Occasionally, the youth specialists are required to accompany juveniles, who are assigned to their facility, on camping expeditions for periods of from 2 to 4 days at a time. These camping expeditions, or "trecks," usually involve a trip to a wilderness area in a National or State park where a temporary camp site is established. These camp sites are in remote or isolated areas, and they provide none of the support or recreational facilities which are commonly found in public camp sites in these same parks. Although "trecks" are normally scheduled to take place once or twice a month, the same youth specialists are not always assigned to participate in them.
>
> In your letter, you state that the youth specialists "have custodial care for the assigned juveniles for the entire period of the "treck" and that the youth specialists "may sleep in tents . . . at the camp sites." You wish to know if this time spent sleeping may be excluded, for the purpose of applying FLSA, from the total hours worked by the youth specialists during the "treck."

1987 DOLWH LEXIS 60, February 20, 1987

40.      In the referenced situation, employees were sleeping in tents, in remote or isolated wilderness areas, with "none of the support or recreational facilities which are commonly found in public camp sites in these same parks." And yet the Administrator allowed for sleep time deductions under 785.22.  As the agency stated: "In this regard, the provisions of section 785.22 of the regulations are specifically applicable to the circumstances involving the youth specialists on 'trecks' as described in your inquiry." *Id.*

41.      Surely sleeping facilities on mattresses in a home with air conditioning and heating and bathrooms, refrigerators and TV's, are at least as adequate for sleeping as tents in undeveloped wilderness areas.

42.     Indeed, one court has taken this Opinion Letter as the basis for deciding that employees who sleep in bunkhouses and even those who sleep in tipis have still been provided adequate sleeping facilities for purposes of 29 CFR 785.22:

> VisionQuest is a company which provides rehabilitation services for youthful offenders throughout the United States. Plaintiff was hired in May 1994 as a "Tipiforeman" at one of VisionQuest's facilities. He was terminated for misconduct in November, 1994.
>
> VisionQuest hires "Tipiforemen" and "Tipiparents" for four types of programs: the Medicine Morse Lodge Impact Camp at which Plaintiff was employed, which employs both tipis and trailers or "bunkhouses" as sleeping facilities; OceanQuest, which is usually conducted aboard one of two 130-foot sail boats; Rough Riders Wagon Train, which is a mobile camp employing trailers and tipis for sleeping facilities; and the South Mountain Lodge Impact Camps, both of which employ trailers and tipis for sleeping facilities. The sleeping facilities differ somewhat from time to time and program to program.
>
> *        *        *
>
> The Department of Labor has issued an opinion letter reviewing a similar program at which "youth specialists" took youth offenders on two-to-four day camping trips and slept in tents at the camp sites. DOL Opinion Letter (February 20, 1987) (VisionQuest's Opposition to Plaintiff's Motion to Compel, at Exhibit A). The opinion letter finds the exclusion of sleep-time appropriate under those circumstances even when the "youth specialists" are occasionally awakened during the night to handle situations which arise, so long as the time spent handling those situations is counted as hours worked. If the employee is unable to get at least five (5) hours of sleep in a given night, the entire twenty-four hour period must be - counted as hours worked.
>
> VisionQuest's sleep-time policy is identical in all material respects to the one approved in the DOL opinion letter. This policy does not appear to be in violation of the FLSA. Plaintiff falls to allege in his Complaint that he, or the proposed members of his class of "similarly situated" "counselors" were not furnished with adequate sleeping facilities or were not able to generally get eight hours of uninterrupted sleep. Rather, he alleges that he was not provided with "personal quarters" for sleeping.  [*14]  Complaint, at 14. We see no requirement in the FLSA that VisionQuest furnish personal quarters under the facts alleged.

*Spellman v. VisionQuest National, Ltd.*, 1998 U.S. Dist. LEXIS 4298, *4-6 (W.D. Pa., February 13, 1998).  Again, if a tipi in the wilderness is an adequate sleeping facility, so is a mattress in a comfortable home.

43.     In addition to sleeping areas in alcoves in the common areas of the facilities, each facility has a locked storage area accessible only to the staff, allowing them to safely store their personal property.  There is a Staff-only bathroom, to which the clients have no access. There is a full kitchen, with food in the refrigerator and pantry. The homes are heated and air conditioned and are safe. Voyles Decl. ¶ 5; O'Neal Report pp. 15-16.

**Issue No. 4: Alleged Failure by Direct Care Staff to Record Interruptions**

44.     One of the allegations by the Plaintiffs is that employees who were interrupted during their eight-hour sleep time period did not record these interruptions, and so were not paid for all hours worked.  Defendants clearly instructed their Direct Care Staff to record all interruptions for calls to duty, to comply not only with FLSA requirements but to comply with state law as well.  The clients residing at Defendants facilities are wards of the state, and the state requires that the Defendants record any incidents concerning them. Voyles Decl. ¶¶ 3, 7.

45.     While reaffirming the obligation that employers who know that overtime has been worked must pay that overtime, as discussed below courts have also held that where employers did not and could not know of overtime worked by employees, no such obligation exists.  Further, such knowledge on the part of employers is an element of Plaintiffs' case, one that in this case has not been met.  In any event, it is not an affirmative defense on the part of the employer.

46.     An employee is "employed" for purposes of the FLSA during alleged overtime hours if an employer has actual or constructive knowledge that the employee was working. *Newton v. City of Henderson*, 47 F.3d 746, 748 (5th Cir. 1995) (*citing Davis v. Food Lion*, 792 F.2d 1274, 1276 (4th Cir. 1986)). Indeed, the Fifth Circuit has been clear that "[a]n employer who is armed with [knowledge that an employee is working overtime] cannot stand idly by and allow an employee to perform overtime work without proper compensation." *Id*. (internal quotation marks omitted) (*quoting Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981)).

47.     If, however, "the employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation of § 207." *Id.* at 748 (internal quotation marks omitted) (*quoting Forrester*, 646 F.2d at 414). *Green v. Digco Util. Constr., LP*, No. 4:12-cv-2942, 2013 U.S. Dist. LEXIS 168962, at *7 (S.D. Tex. Nov. 27, 2013). See also:

> The dispute before us simply concerns whether, as a procedural matter, proof of an employer's knowledge is an element of the plaintiff/employee's case or whether lack of knowledge is an affirmative defense to be raised and proved by the employer. Upon review of the Act and the applicable case law, we find that the district court correctly required Davis to prove Food Lion's actual or constructive knowledge of his overtime work as an element of his case.
>
> *         *         *
>
> Finally, the district court found that the company policy against off-the-clock work was fully enforced by Food Lion. As a consequence, the court noted that to accept Davis' theory of the case would mean that Food Lion should have anticipated that employees would routinely falsify their time records in violation of established company policy.

*Davis v. Food Lion*, 792 F.2d 1274, 1278 (4th Cir. 1986).

48.     Further, there is no evidence whatsoever that interruptions were not recorded, as Plaintiffs allege. Roxann Voyles, Bookkeeper/Account Manager, examined every incident report completed by Plaintiffs in the three-year period prior to the filing of the original complaint. Incident reports are reports required to be filed by the employers' policies, and by state law, whenever there is an incident involving a resident, such as an attempt to run away. DCS are also instructed to adjust their time sheets accordingly whenever there was such an incident during their sleep time. Ms. Voyles then reviewed the time sheets which corresponded to the incident reports. There was not a single instance in which any of the Plaintiffs filled out an incident report but did not record the time spent dealing with the incident, and/or were not paid for the time. Voyles Decl. ¶¶ 8, 10-11.  The allegations of Davis and Humphrey in their Interrogatory Responses that they were interrupted by fights between residents or attempts by residents might be true, but if they

followed policy, such interruptions would have been documented by an Incident Report, and if the incidents had occurred during their sleeping periods, they would have filled out a form to report the time expended on the incident and been paid for the time.

49.     The requirements of the Defendants that their Direct Care Staff members record their time, and the absence of any evidence whatsoever that the Defendants knew that Direct Care Staff were allegedly working but failing to record their time, conclusively disposes of this allegation.

**Issue No. 5: Any Purported Violations Were Not Willful**

50.     Plaintiffs challenge the Defendants' practice of deducting designated sleep time from the total of compensable hours of work for those of Defendants' employees who are on duty for twenty-four (24) hours or more. Plaintiffs claim that Defendants had not met the necessary conditions for making such deductions.  Without in any way conceding that Defendants were wrong in making sleep time deductions, they did so following advice of counsel. Ex. 4 (Declaration of Randall Bryant) ¶ 6. This precludes any finding that Defendants' conduct was willful.

51.     The FLSA authorizes employees to bring actions to recover unpaid minimum wages and/or overtime payments due. The statute of limitations for such actions was added to the FLSA in 1947 by the Portal to Portal Act, 29 U.S.C. 255(a). In general, the statute of limitations is two years back from the date the lawsuit was filed, and/or when Consents to be Plaintiff are filed. If the Court finds any violations were willful, the statute of limitations is extended to three years.

52.     Plaintiff's Original Complaint was filed on February 28, 2020, and Consents to be Plaintiff for Davis and Humphrey were filed with it. Consents to be Plaintiff were filed by Marchiniak and Randolph on March 4, 2020. Consents for Leung-Lo Hing and Robinson were filed on March 25, 2020. The dates of termination of these Plaintiffs are:

| Davis: | September, 2018 |
| Humphrey: | August, 2018 |
| Marchiniak: | July, 2017 |
| Randolph: | May, 2017 |
| Leung-Lo Hing: | August, 2017 |
| Robinson: | December, 2017 |

Complaint ¶¶ 5-6 (Davis and Humphrey); Notices of Consent (Marchiniak, Randolph, Leung-Lo Hing and Robinson).

53.    The practice of which Plaintiffs complain, the deduction of up to 8 hours of sleep time from duty periods of 24 hours or more, was discontinued by Defendants effective May 14, 2018. Voyles Decl. ¶ 12.  Accordingly, if the purported violations were not willful, the statute of limitations for Davis and Humphrey extends back to March 1, 2018. The maximum period of violations for these employees would thus be from March 1, 2018 to May 14, 2018, when the practice of which they complain was discontinued, a period of approximately 6 weeks. Under the non-willful two-year statute of limitations, the other four plaintiffs are barred from any recovery whatsoever.

**Willfulness Under the FLSA**

54.    The standard for holding that a violation of the FLSA is willful was set out by the Supreme Court in *McLaughlin v. Richland Shoe, Inc.*, 486 U.S. 128, 133 (1988).

**Willfulness Before <u>Richland Shoe</u>—<u>Jiffy June Farms</u>**

55.    Before the *Richland Shoe* case, the willfulness standard recognized and applied by the U.S. Department of Labor, Wage and Hour Division ("USDOL/WH") was referred to as the "in the picture" standard.  This standard was derived from a Fifth Circuit case, *Coleman v. Jiffy*

*June Farms*, 458 F.2d 1139 (5th Cir. 1972).  In *Richland Shoe*, the Supreme Court identified and

described the "in the picture" standard:

> The Fifth Circuit has held that an action is willful when 'there is substantial
> evidence in the record to support a finding that the employer knew or suspected
> that his actions might violate the FLSA. Stated most simply, we think the test
> should be: Did the employer know the FLSA was in the picture?' *Coleman v. Jiffy
> June Farms, Inc.,* 458 F.2d 1139, 1142 (5th Cir.)[cert. denied, 409 U.S. 948
> (1972)]
>
> This standard requires nothing more than that the employer has an awareness of
> the possible application of the FLSA. *Id.; Castillo v. Givens,* 704 F.2d 181, 193
> (5th Cir. 1983)[cert denied, 486 U.S. 850 (1983)]  'An employer acts willfully and
> subjects himself to the three year liability if he knows, or has reason to know, that
> his conduct is *governed* by the FLSA.' *Brennan v. Heard*, 491 F.2d 1, 3 (5th Cir.
> 1974) (emphasis in original). *See also Donovan v. Sabine Irrigation Co., Inc.,* 695
> F.2d 190, 196 (5th Cir. 1983)[cert. denied, 463. U.S. 1207 (1983)].

56.     The problem with the "in the picture" standard, said the Supreme Court in *Richland*

*Shoe*, was that it "virtually obliterates any distinction between willful and nonwillful violations."

Id @ 132-3.  Of particular relevance to this case, the Court noted that:

> In addition, the *Jiffy June* standard would impose a third year of liability even on
> those employers who **firmly and reasonably (albeit wrongly) believe that their
> pay practices are lawful**, a result that seems counter to the concerns expressed in
> the legislative process during the 89th Congress." Brief for Petitioner 39-40
> (footnote omitted). Id @ 134 (emphasis added)

**Willfulness Under <u>Richland Shoe</u>**

57.     So, in place of the Jiffy June "in the picture" standard, the Court adopted the same

willfulness definition it had already adopted for Age Discrimination in Employment cases in *Trans*

*World Airlines, Inc. v. Thurston,* 469 U.S. 111 (1985):

> The standard of willfulness that was adopted in *Thurston* -- that the employer
> either knew or showed reckless disregard for the matter of whether its conduct
> was prohibited by the statute -- is surely a fair reading of the plain language of the
> Act.  Id @ 133,

MOTION FOR SUMMARY JUDGMENT – Page 21

58.     The burden of proof regarding willfulness is on the Plaintiffs: "Plaintiffs bear the burden of establishing a defendant's willfulness. *Ikossi-Anastasiou v. Bd. of Supervisors of La. State Univ.*, 579 F.3d 546, 552 (5th Cir. 2009)." *Dacar v. Saybolt, L.P.*, 914 F.3d 917, 920 (5th Cir. 2018).

59.     Even negligence in determining the application of the Act does not constitute willfulness:

> For example, an employer that "act[s] without a reasonable basis for believing that it was complying with the [FLSA]" is merely negligent, *McLaughlin*, 486 U.S. at 134-35, as is an employer that, without prior notice of an alleged violation, fails to seek legal advice regarding its payment practices, *e.g, Mireles*, 899 F.2d at 1416. *Mohammadi v. Nwabuisi*, 605 F. App'x 329, 332 (5th Cir. 2015)

The clear implication of this statement from the Mohammadi court is that an employer who does seek legal advice is not even negligent.

60.     Defendants did in fact consult with counsel experienced in FLSA matters, and relied on his advice in adopting their system of sleep time deductions. Bryant Decl. ¶ 6. Such reliance, in the absence of evidence to the contrary, precludes a finding of willfulness. *See Halferty v. Pulse Drug Co., Inc.*, 826 F.2d 2, 3 (5th Cir. 1987) (finding the employer did not act in reckless disregard because it consulted with its attorney and examined the Department of Labor bulletin discussing 29 C.F.R. § 785.23 in attempting to determine whether its plan would violate the FLSA); *Beck v. Access E Forms, LP*, Civ. A. No. 16-CV-00985, 2018 U.S. Dist. LEXIS 133696, 2018 WL 4537241, at *7 (E.D. Tex. Aug. 8, 2018),  adhered to as amended, Civ. A. No. 4:16-CV-00985, 2019 U.S. Dist. LEXIS 132266, 2019 WL 3717633 (E.D. Tex. Aug. 7, 2019) ("Good faith and reasonableness, including a putative employer's consultation with an attorney, are defenses to allegations of willfulness."); *Lipnicki v. Meritage Homes Corp.*, Civ. A. No. 3:10-CV-605, 2014 U.S. Dist. LEXIS 32951, 2014 WL 923524, at *10 (S.D. Tex. Feb. 13, 2014) (finding that failing

to seek legal advice about its pay practice does not evidence a willful violation of the statute by the employer).

61.     Defendants acknowledge that consultation with counsel does not automatically dispose of any possibility of a willfulness finding:

> Whether a violation is willful is a question of fact reserved for the finder of fact. See Ikossi-Anastasiou v. Bd. of Supervisors of La. State Univ., 579 F.3d 546, 553 (5th Cir. 2009) [*22] ("Because willfulness is a question of fact, summary judgment in favor of the employer is inappropriate if the plaintiff has introduced evidence sufficient to support a finding of willfulness."); Reich v. Tiller Helicopter Servs., Inc., 8 F.3d 1018, 1036 (5th Cir. 1993); Karr v. City of Beaumont, Tex., 950 F. Supp. 1317, 1325 (E.D. Tex. 1997). Barnard v. Intertek USA Inc., No. H-11-2198, 2012 U.S. Dist. LEXIS 127539, at *21-22 (S.D. Tex. Aug. 2, 2012)

In the instant case, however, Plaintiffs have NOT introduced evidence sufficient to support a finding of willfulness, nor can they, as such evidence does not exist. Accordingly, the Court should rule that Defendants conduct was not willful, and that therefore the two-year statute should apply.

**Issue No. 6: Good Faith Defense Against the Imposition of Liquidated Damages**

62.     Defendants recognize that if back wages are awarded, the general rule is that liquidated damages equal to the back wages are awarded as well. However, the FLSA, as amended by the Portal Act of 1947, offers defendants a defense: "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of such title." Defendants believed in good faith that their conduct complied with the Act.

63.     Here Defendants' management was familiar with industry practice in Texas with regard to sleeping facilities. Moreover, Defendants were members of TACFS, the Texas Alliance of Child and Family Services, and Randall Bryant and other staff regularly attended the Texas Child Care Administrators Conference put on by the Alliance, at which FLSA compliance was a

topic on several occasions. In addition, in 2008, Defendants consulted with Brian Farrington on how to comply with the FLSA.   Bryant Decl. ¶¶ 5-6; Voyles Decl. ¶ 2.  Accordingly, Defendants contend that even if back wages are awarded, no liquidated damages would or should be awarded, and the Court should so rule.

WHEREFORE, the above premises considered, the Defendants respectfully request that the court enter an order granting the Defendants' summary judgment in this case decreeing that Plaintiffs and the consent parties take nothing, and granting the Defendants such other and further relief to which they may be entitled both at law and in equity.

Respectfully submitted,

By: */s/ Sim Israeloff*
    **BRIAN T. FARRINGTON**
    Texas Bar No. 00790667

    **SIM ISRAELOFF**
    Texas Bar No. 10435380

**COWLES & THOMPSON, P.C.**
901 Main Street, Suite 3900
Dallas, TX 75202
(214) 672-2117 (Tel)
(214) 672-2317 (Fax)
E-mail: bfarrington@cowlesthompson.com
E-mail: sisraeloff@cowlesthompson.com

**ATTORNEYS FOR DEFENDANTS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served on all counsel and

parties of record by e mail on this 24th day of May 2021.

*/s/ Sim Israeloff*_____

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **DEVERY DAVIS and CLIFTON** | § | **CIVIL ACTION NO. 4:20-cv-00724** |
| **HUMPHREY, INDIVIDUALLY AND** | § | |
| **ON BEHALF OF ALL OTHERS** | § | |
| **SIMILARLY SITUATED,** | § | |
| | § | |
| **Plaintiffs** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **FIVE OAKS ACHIEVEMENT** | § | **COLLECTIVE ACTION** |
| **CENTER, LLC d/b/a FIVE OAKS** | § | |
| **ACHIEVEMENT CENTERS;** | § | |
| **WHISPERING HILLS ACHIEVEMENT** | § | |
| **CENTER, LLC d/b/a WHISPERING** | § | |
| **HILLS ACHIEVEMENT CENTER; and** | § | |
| **NORTH FORK EDUCATIONAL** | § | |
| **CENTER, LLC d/b/a NORTH FORK** | § | |
| **EDUCATIONAL CENTER** | § | |
| | § | |
| **Defendants.** | § | |

## DECLARATION OF ROXANN VOYLES

Pursuant to 28 U.S.C. § 1746 (Unsworn declarations under penalty of perjury), Roxann

Voyles states as follows:

1.      I am the Bookkeeper/Account Manager for Defendants Five Oaks Achievement

Center, LLC, Whispering Hills Achievement Center, LLC and North Fork Educational Center,

LLC.  I have held this position since April 15, 2003. As part of my job duties I am one of the

records custodians of each company and have personal knowledge of the following facts, which

are true and correct.

2.      Defendants Licensed Child Care Administrators to include CEO elected to attend

the annual conference held by the Texas Alliance of Child and Family Services  to get their

mandatory 15 hours of Continued Education (CEU).  In 2008, Defendants consulted with attorney Brian Farrington on how to comply with the FLSA

### Nature of Defendants' Business

3.      Defendants operate highly regulated residential treatment centers for abused and neglected children including some with special needs.  Residents include "intense" and "intense psychiatric" minors who may engage in violence against each other as well as sexual abuse.  Direct Care Staff (DCS) employees must be on site and ready to respond instantly.  Because of the heavily regulated nature of the business an Agreement of Hours Worked is required from all Direct Care Staff that included those listed below.

### Work Shifts, Adequate Sleeping Accommodations, and Sleep Time Deductions

4.      Plaintiffs and the consent parties are former DCS employees.  Pursuant to their Agreements on Hours Worked described below, Plaintiffs worked 96 hour work shifts, 4 days-on and 4 days-off, and slept on site during their work shifts between 10 p.m. and 6 a.m., but did not live on site or sleep on site outside of their 96 hour work shifts.  Pursuant to applicable regulations (which I am informed are at 29 CFR 785.22), and as agreed to in their Agreement on Hours Worked, Defendants deducted up to 8 hours sleep time per day from DCS employees' total work hours per shift.  On a normal shift, therefore, Plaintiffs were paid for 16 hours per day during each work week, 40 hours at regular pay and time and a half for any hours over 40.

5.      Defendants provided adequate sleeping accommodations for DCS employees and employed additional Night Awake employees who were on duty during the designated sleep periods for DCS employees from 10 p.m. to 6 a.m..  Each DCS employee also acknowledged in their Agreement on Hours Worked that they were provided with sleeping facilities adequate to get a reasonable night's sleep.  In November 2016, employees at Five Oaks and North Fork were provided with tented beds for sleeping in privacy.  Each facility has a locked storage area

DECLARATION OF ROXANN VOYLES – Page 2
#1602875

accessible only to the staff, allowing them to safely store their personal property.  There is a Staff-only bathroom, to which the clients have no access. There is a full kitchen, with food in the refrigerator and pantry. The homes are heated and air conditioned, and are safe.  Defendants also incurred significant expenditures on pest control services to ensure, as best as they could, for a pest-free environment.

6.      Defendants typically deducted 8 hours of sleep time from DCS employees' total work hours from each 24 hours of their 96 hour work shift.  However, if a DCS employee was awakened during their designated sleep time to take care of a child or had to cover for a night shift employee during sleep time, they were required to document such extra work, first by turning in a mandatory Incident Report when child related and second, by adding the time to their time sheet or using time clock to log on duty, or obtaining an Employee Time Correction Request form when employee didn't document on time sheet or log into the time clock, and Plaintiffs were paid for all additional working hours they reported.  If a DCS employee did not get 5 hours of uninterrupted time off during their designated sleep period they were paid for the entire 24 hour period. Plaintiffs were advised of the pay system upon hire and agreed to it in written Agreements on Hours Worked.  Attached hereto collectively as Exhibit A are Agreements on Hours Worked signed by Plaintiffs Davis and Humphrey.  Similar agreements were provided to each DCS employee including the consent plaintiffs.

**Required Reports and Documentation**

7.      DCS employees like the Plaintiffs are required to turn in Daily Progress Reports and Incident Reports accounting for the activity, behavior, interaction/intervention with and comments on each resident including any Incidents occurring during sleep periods.  The reports had to be submitted by DCS employees by 9 a.m. the following day.  Employees were also responsible for the adequacy of their own timesheets and had to sign and affirm that all of their

reported hours were true and correct.  Employees were required to clock in and out of work using Five Oaks' time clocks, Five Oaks started using electronic time clocks in 2016.  Any missed additional work hours had to be submitted on Employee Time Correction Reports.

8.      Each plaintiff regularly submitted the mandatory Incident Reports showing the time of all Incidents with residents, and regularly submitted the mandatory Employee Time Correction Requests showing any missed work hours, and they were paid for all reported hours.  Samples of Incident Reports from Plaintiffs Davis and Humphrey are attached hereto collectively as Exhibit B.  Similar reports were turned in by each DCS employee.  Samples of Employee Time Correction Reports from Plaintiffs Davis and Humphrey are attached hereto collectively as Exhibit C.  Similar reports were turned in by other DCS employees.

9.      All of the Incident Reports and Employee Time Correction Reports for each Plaintiff and consent party have been produced to the Plaintiffs in discovery.  All such records including Exhibits B and  C were made at or near the time by — or from information transmitted by — someone with knowledge of the event or incident.  The records are kept in the course of a regularly conducted activity of each Defendant's businesses, and making such records is a regular practice of each Defendant.

10.      Defendants' business records produced to the Plaintiffs including Exhibits B and C show that Plaintiffs actually reported any missed work hours during designated sleep times, either due to an Incident Report during sleep times or due to hours they worked for one of the night shift, all as stated on Employee Time Correction Reports.  Reported Incidents were rare between the hours of 10 p.m. and 6 a.m..  The records demonstrate that Plaintiffs knew how to document, and did document, whenever they had added work hours during their designated sleep times.

**Absence of Evidence in the Business Records**
**(Rule 803(7), Fed. R. Evid.)**

11.      I reviewed the Incident Reports and Employee Time Correction Requests from each plaintiff and consent party.  Such business records do not include any evidence that any plaintiff or consent party suffered a sleep interruption due to a call to duty for which they were not paid when Time Correction Reports were submitted for missed hours.  There is an *absence of evidence* in the business records that any plaintiff or consent party was not paid for a sleep interruption resulting from a call to duty or from filling in for a night shift employee when a Time Correction Report was submitted for missed hours.  If their sleep was interrupted by a call to duty which they did not report on these required forms, then Defendants would have no way of knowing that there had been additional hours worked during designated sleep times.  I am not aware that this ever occurred.

**Discontinuance of Sleep Time Deduction**

12.      On May 14, 2018, the pay structure for DCS employees was revised and the 8 hour sleep time deduction was eliminated. Thereafter, employees were paid for 24 hours for each day they were on shift even if they were sleeping.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 21, 2021.


*/s/ Roxann Voyles*

# Exhibit A

## Agreement on Hours Worked

This agreement is between Five Oaks Achievement Center, hereinafter "Employer," and
_Devery J Davis_ , hereinafter "Employee." Employee is employed as a Direct
Care Staff Member, and is assigned to work shifts of 96 hours. Employee acknowledges that
he/she is provided with sleeping facilities adequate to get a reasonable night's sleep. Employee
and Employer therefore agree that the hours of 10 PM to 6 AM will be designated as a sleeping
period, and if Employee is not interrupted during this sleeping period, 8 hours will be deducted
from the Employee's total number of hours worked on that shift.

If the sleep period is interrupted to such an extent that the employee cannot get "a reasonable
night's sleep," which means at least five (5) hours of sleep, then the entire sleep period is
considered working time.

All employees are responsible for their own time sheet and documenting their time worked.

NOTE: Employment at Five Oaks Achievement Center is "at-will." This means that the
employment relationship is for no set term, and either the employer or the employee may
terminate the employment relationship at any time for any reason. Nothing in this Agreement on
Hours Worked alters or is intended to alter the "at-will" nature of Employee's employment.

| _Bernecke Hantt_ 11/10/16 | | _Devery J Davis_ 11/10/16 | |
|---|---|---|---|
| Employer | Date | Employee | Date |

## Paid Time Off

Paid time off, such as holiday, vacation, and sick pay, is counted as regular hours worked and not
overtime pay.

## Workweek

Employer designates the period Monday through Sunday as its official workweek for payroll
purposes.

## Overtime (time and a half)

Overtime is considered actual hours worked after 40 hours within a workweek Monday through
Sunday. Overtime is calculated by base pay and half of base pay multiplied by total number of
hours actually worked over 40.

## Agreement on Hours Worked

This agreement is between Five Oaks Achievement Center, hereinafter "Employer," and Clifton Humphrey, hereinafter "Employee." Employee is employed as a Direct Care Staff Member, and is assigned to work shifts of 96 hours. Employee acknowledges that he/she is provided with sleeping facilities adequate to get a reasonable night's sleep. Employee and Employer therefore agree that the hours of 10 PM to 6 AM will be designated as a sleeping period, and if Employee is not interrupted during this sleeping period, 8 hours will be deducted from the Employee's total number of hours worked on that shift.

If the sleep period is interrupted to such an extent that the employee cannot get "a reasonable night's sleep," which means at least five (5) hours of sleep, then the entire sleep period is considered working time.

All employees are responsible for their own time sheet and documenting their time worked.

NOTE: Employment at Five Oaks Achievement Center is "at-will." This means that the employment relationship is for no set term, and either the employer or the employee may terminate the employment relationship at any time for any reason. Nothing in this Agreement on Hours Worked alters, or is intended to alter the "at-will" nature of Employee's employment.

_Berneatee Gantt_     9/8/16        _Clifton Humphrey_     9/16/16

Employer            Date            Employee            Date


### Paid Time Off

Paid time off, such as holiday, vacation, and sick pay, is counted as regular hours worked and not overtime pay.

### Workweek

Employer designates the period Monday through Sunday as its official workweek for payroll purposes.

### Overtime (time and a half)

Overtime is considered actual hours worked after 40 hours within a workweek Monday through Sunday. Overtime is calculated by base pay and half of base pay multiplied by total number of hours actually worked over 40.

**DEFENDANT 003234**

# Exhibit B

# INCIDENT

## Five Oaks Achievement Center, LLC

Date: 4/18/18                    Time: 4:10   AM  (PM)

**Resident:** ████████████

Staff Reporting: Devery Davis

Location of Incident (specific): Eagle

**Provide a detailed description of the incident, including events leading up to it, those individuals involved and staff's response:**

Client R.G was playing the game. His peers asked him was his time up. Client jumped up and said fine walking to the other side of the livingroom. Client then got upset and walked towards the front door. Staff told client to stop. Client didn't comply and continue walking outside. Staff followed client trying to calm him down. Finally client stopped and returned back to Eagle. Client appears to be back on task now outside front porch area playing catch with peers.

Reporter Initials: D.D

**CONTINUED ON BACK**

# RESULTS OF INCIDENT

**BEHAVIOR(S)** *(mark all that apply and be sure that it's also indicated on the DAILY progress note):*

☐C: Compliant
☑NC: Non-Compliant
☑OT: Off-Task
☐TO: Temper Outburst
☐PRV: Provoking Peer(s)
☑PA: Poor Attitude
☑LAA: Leaving Assigned Area
☐LY: Lying

☐RUN: Run/Darting
☐PHP: Physical Aggression towards Peer
☐PHS: Physical Aggression towards Staff
☐VAP: Verbal Aggression towards Peer

☐VAS: Verbal Aggression towards Staff
☐SH: Self-Harm
☐PD: Property Damage
☐SXC: Inappropriate Sexual Conduct
☐SXV: Inappropriate Sexual (verbal only)

**INJURY?**   ☑No   ☐Yes      If yes, explain/where: _____

**Client Response:**

Said he was upset because he had to get off game, That his peers always runs him off playing games

**Incident Prepared By (printed name):** Devery Davis

**Signature:** Devery Davis

**Follow-up:** By whom: Devery Davis      Time: 8:20   AM  (PM)

Client appears to be back on task following his daily schedule.

Review incident with client: Date: 4/18/18   Time: 8:20   AM  (PM)

Client Signature: ███████████████

Reviewed by Supervisor: _____      Date: 04/18/18

**\*\*Incidents must be reported as soon as possible to management. Reports are to be turned in by 9:00am the next business day.**

# Five Oaks Achievement Center, LLC

Date: 12/02/17    Time: 4:55 AM PM

Resident: ███████████████████

Staff Reporting: Clifton Humphrey

Location of Incident (specific): Lakehouse Bedroom 4

**Provide a detailed description of the incident, including events leading up to it, those individuals involved and staff's response:**

Client woke up and went
to bathroom and then got
a bottle of water and returned
back to the room and made
some Kool-aid, which their
are no containers allowed in
the room. When approached by
staff client ████ became argumentive
with staff

Reporter Initials: CH

**CONTINUED ON BACK**

Created 07/02/14

DEFENDANT 003445

# Five Oaks Achievement Center, LLC

Date: 5/13/18   Time: 8 23 AM (PM)

**Resident:** ███████████████████

Staff Reporting: Clifton Humphrey

Location of Incident (specific): Eagle (Shoe Closet)

**Provide a detailed description of the incident, including events leading up to it, those individuals involved and staff's response:**

Client was lying in his bed and listening to his radio (MP3) staff was sleeping client ███ room, all of a sudden client walked out of his room and went into the shoe closet and closed the door. Staff went into the shoe closet to get ███ he couldn't be in there, Client ███ started cursing staff stated what you gonna do and stating he was going to beat he behind, constantly threatening staff also got into staff face stating he will beat staff ass, staff stated to ███ to get out off his face and give staff their face, Client came out of shoe closet and left the building without staff's permission and started walking on campus.

Reporter Initials: CH

**CONTINUED ON BACK**

Created 07/02/14
**DEFENDANT 003413**

# RESULTS OF INCIDENT

**BEHAVIOR(S)** *(mark all that apply and be sure that it's also indicated on the DAILY progress note)***:**

☐C: Compliant
☐NC: Non-Compliant
☐OT: Off-Task
☐TO: Temper Outburst
☐PRV: Provoking Peer(s)
☐PA: Poor Attitude
☐LAA: Leaving Assigned Area
☐LY: Lying

☐RUN: Run/Darting
☐PHP: Physical Aggression towards Peer
☐PHS: Physical Aggression towards Staff
☐VAP: Verbal Aggression towards Peer

☐VAS: Verbal Aggression towards Staff
☐SH: Self-Harm
☐PD: Property Damage
☐SXC: Inappropriate Sexual Conduct
☐SXV: Inappropriate Sexual (verbal only)

**INJURY?**     ☐No   ☐Yes      If yes, explain/where: _____

**Client Response:**

_Stating that he was going to kick staff ass!_

**Incident Prepared By (printed name):** _Clifton Humphrey_

**Signature:** _Clifton Humphrey_

**Follow-up:**     **By whom:** _Clifton Humphrey_     **Time:** _10:30_   AM   **PM**

_Processed with client to let him know what he did wrong, then went to bed._

**Review Incident with client: Date:** _5/13/18_     **Time:** _1045_   AM   **PM**

**Client Signature:** _h.M_

**Reviewed by Supervisor:** _____     **Date:** _8/14/18_

**\*\*Incidents must be reported as soon as possible to management. Reports are to be turned in by 9:00am the _next_ business day.**

DEFENDANT 003414
Created 07/02/14

# Exhibit C

# Five Oaks Achievement Center, LLC.

## Employee Time Correction Request

**Employee Name:** Devery Davis _____ **Date Turned in:** 06/03/17 _____

**Date:** 06/03/17 _____ **Clock in time:** _____ **Clock out time:** _____

**Reason for Change (Circle all that apply):**

1.) Forgot to clock in/ out

2.) Use available PTO

3.) Clock did not recognize me @ which house _____

(4.) Other (explain)
Staff worked overtime due to late paperwork at lake. 10pm - 11pm _____
_____

**Date:** _____ **Clock in time:** _____ **Clock out time:** _____

**Reason for Change (Circle all that apply):**

1.) Forgot to clock in/ out

2.) Use available PTO

3.) Clock did not recognize me @ which house _____

4.) Other (explain)
_____
_____

**Overtime: (Circle all that Apply)** Sage   Bluebonnet   Eagle   (Lake)

(Gloria)   Kenneth   Wilson   Marvin   **Supervisor Signature:** _____

**Dates this pay period staff used for overtime:** 06/03/17 _____
_____

DEFENDANT 000092

# Five Oaks Achievement Center, LLC.

## Employee Time Correction Request

Employee Name: _Clifton Murphey_ _____   Date Turned in: _01/05/17_ _____

Date: _01/05/17_ _____   Clock in time: _____   Clock out time: _____

Reason for Change (Circle all that apply):

1.) Forgot to clock in/ out

2.) Use available PTO

ENTERED
7/10/17 _BD_

3.) Clock did not recognize me @ which house _____

(4.)) Other (explain)

_Staff worked overtime due to late (ER) run with client. (10pm - 11:01pm)_ _____

_____

Date: _____   Clock in time: _____   Clock out time: _____

Reason for Change (Circle all that apply):

1.) Forgot to clock in/ out

2.) Use available PTO

3.) Clock did not recognize me @ which house _____

4.) Other (explain)

_____

_____

Overtime: (Circle all that Apply) (Sage)  Bluebonnet  Eagle  Lake

(Gloria)  Kenneth  Wilson  Marvin  Supervisor Signature: _____

Dates this pay period staff used for overtime: _01/05/17_ _____

_____

DEFENDANT 000048

# Five Oaks Achievement Center, LLC.
## Employee Time Correction Request

Employee Name: __Clifton Humphrey__          Date Turned in: __07/09/17__

Date: __07/09/17__          Clock in time: _____          Clock out time: _____

Reason for Change (Circle all that apply):

1.) Forgot to clock in/ out

2.) Use available PTO

3.) Clock did not recognize me @ which house _____

(4.) Other (explain)

__Staff worked overtime due campus run away from eagle house. (10:40pm - 12:00Am)__

ENTERED

7/10/17. BJ

Date: _____          Clock in time: _____          Clock out time: _____

Reason for Change (Circle all that apply):

1.) Forgot to clock in/ out

2.) Use available PTO

3.) Clock did not recognize me @ which house _____

4.) Other (explain)

Overtime: (Circle all that Apply) Sage   Bluebonnet  (Eagle)  Lake
(Gloria)  Kenneth  (Wilson)  Marvin  Supervisor Signature: _____
Dates this pay period staff used for overtime: __07/09/17__

DEFENDANT 000049

# Exhibit 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| DEVERY DAVIS and CLIFTON HUMPHREY, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § § § § § | CIVIL ACTION NO. 4:20-cv-00724 |
| Plaintiffs | § § | |
| v. | § § | |
| FIVE OAKS ACHIEVEMENT CENTER, LLC d/b/a FIVE OAKS ACHIEVEMENT CENTERS; WHISPERING HILLS ACHIEVEMENT CENTER, LLC d/b/a WHISPERING HILLS ACHIEVEMENT CENTER; and NORTH FORK EDUCATIONAL CENTER, LLC d/b/a NORTH FORK EDUCATIONAL CENTER | § § § § § § § § § § § | COLLECTIVE ACTION |
| Defendants. | § | |

## DECLARATION OF RANDALL G. (RANDY) O'NEAL

Pursuant to 28 U.S.C. § 1746 (Unsworn declarations under penalty of perjury), Randall G. (Randy) O'Neal states as follows:

1.      My name is Randall G. (Randy) O'Neal.  I am a wage and hour consultant and a former investigator and regional director of enforcement of the Wage and Hour Division of the United States Department of Labor.  During my time at the Department of Labor I personally conducted more than 1,000 investigations, primarily under the provisions of the Fair Labor Standards Act (FLSA).  I was engaged in this action to visually inspect the 3 separate facilities operated by Defendants, review relevant documents and testimony, and inform myself sufficiently to render an opinion with regard to issues relative to Defendants' compliance with the FLSA.  As such I have personal knowledge of the following facts, which are true and correct.

2.      Attached hereto as Exhibit A is a true and correct copy of my Expert Witness Report dated May 1, 2021, which contains my observations, findings and opinions relative to the matters at issue in this case.

3.      I declare under penalty of perjury that the foregoing is true and correct. Executed on May 21, 2021.

*/s/ Randall G. O'Neal*

DECLARATION OF RANDALL G. O'NEAL – Page 2

# Exhibit A

**RANDALL G. O'NEAL**
**EXPERT WITNESS REPORT**
**May 1, 2021**

*DEVERY DAVIS* and CLIFTON HUMPHREY, INDIVIDUALLY
AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,
Plaintiffs,
v.
FIVE OAKS ACHIEVEMENT CENTER, LLC d/b/a
FIVE OAKS ACHIEVEMENT CENTER; WHISPERING
HILLS ACHIEVEMENT CENTER; and
NORTH FORK EDUCATIONAL CENTER, LLC d/b/a
NORTH FORK EDUCATIONAL CENTER,
Defendants.
United States District Court
Southern District of Texas
Houston Division
Civil Action No.: 4:20-cv-00724

**Executive Summary**

I am a wage and hour consultant who has been in private practice for over 6 years.  Prior to that

I worked for the Wage and Hour Division (WHD or the Division) of the United States

Department of Labor for about 40 years.  The first 15 years of my WHD tenure were spent as an

investigator where I individually conducted more than 1,000 investigations, primarily under the

provisions of the Fair Labor Standards Act (FLSA or the Act).  For the final 20 years of my career

1

with WHD, I directed all enforcement work in the Southwest Region, which spreads across the middle of the country from Montana to Louisiana.

In this matter I was engaged to visually inspect the 3 separate facilities operated by Defendants, review relevant documents and testimony, and inform myself sufficiently to render an opinion with regard to 3 issues or questions, each relative to compliance with the FLSA.  The issues are:

1)  Did Defendants provide adequate sleeping facilities for Plaintiffs?

2)  Did Defendants have policies and procedures which would result in the accurate recording of hours worked by Plaintiffs?

3)  If Plaintiffs provide damage estimates, do I find them to be properly computed?

Drawing on my background and experience, I found the sleeping facilities for Plaintiffs in each of the 3 facilities were adequate.  Plaintiffs were provided with their choice of a mattress, air mattress, cot, couch or bedding material as well as linens.  Further, Plaintiffs could sleep in a private room in some facilities, but at minimum could sleep in a separate area of the facility away from the clients' bedrooms and bathroom(s).  Night staff were present during Plaintiffs' sleep period to handle almost all client/resident issues which might arise, so that Plaintiffs could usually enjoy at least 5 hours of uninterrupted sleep.

With respect to the second issue, I found Defendants had a timeclock system which Plaintiffs were instructed to and trained to use.  The timeclocks were easily accessible to Plaintiffs and

Defendants provided time correction forms and a simple process so that should Plaintiffs forget to clock in or out, or experience an interruption during their sleep period, they could provide Defendants with the corrective information.  Plaintiffs had a set work schedule, a 96-hour shift, with a repeating sleep period from 10 PM to 6 AM the following day.  Incidents which caused interruptions to Plaintiffs' set work schedule or sleep period required Plaintiffs complete mandated reports which Defendants reviewed to ensure all hours worked, including those resulting from sleep-period interruption(s), were properly reported and compensated.  If Plaintiffs failed to complete these requisite reports, their failure would have prevented Defendants from having any knowledge of an incident, an interruption or of an incorrect time card.

Finally, as of the date of this report, I am unaware of any estimate of alleged damages in this matter.  Consequently, I have not had occasion to review and opine upon any such calculations from Plaintiffs.

**Report**

I, Randall G. O'Neal, am a wage and hour consultant based in Garland, Texas.  By training and experience, I am an expert in wage and hour matters.  I have been a consultant, primarily involving matters related to the Fair Labor Standards Act of 1938 for over 6 years.  Prior to that, I was employed by the Wage and Hour Division of the United States Department of Labor (DOL) in different capacities for approximately 40 years.  I worked as a wage and hour investigator in

Texas and Oklahoma over a period of about 15 years, personally conducting well over 1,000

investigations.  Most of the investigations I conducted regarded the provisions of the FLSA and

a number were of group homes and residential care facilities or other circumstances involving

employees working shifts of 24 hours or more.

The final 25 years of my WHD career were spent in the Southwest Regional Office based in

Dallas, Texas – one of five such offices in the United States. During the 20-year period just prior

to my retirement in 2015, I served as Director of Regional Operations and then as Director of

Enforcement for the 11-state Southwest Region.  Both positions incorporated the supervision of

all enforcement throughout the region.  My responsibilities involved establishing enforcement

initiatives, then providing training and oversight related to those initiatives.  Included in this

work were training and guidance related to hours worked principles under the FLSA.

In collaboration with resources available to me in our national office in Washington D.C. and in

the Office of the Regional Solicitor, it was my responsibility to make decisions on behalf of WHD

in my region as to the application of law, whether certain pay practices violated the law, the

grant or denial of claimed exemptions and how WHD would act to administer and enforce the

laws entrusted to it.  Further, I served on the Division's Enforcement Policy Advisory

Committee.  This committee met periodically in Washington D.C., but more often held regular

conference calls to discuss enforcement matters of national scope.  This included my

participation in discussions and decisions surrounding sleep time for employees working shifts

of 24 hours of more.  Additionally, I was periodically assigned temporarily to the Division's

headquarters in Washington to function in enforcement-related roles, including as national director of enforcement strategy and support.

I selected and led a team which conducted periodic accountability reviews, or audits of each of the 12 district offices in the region.  This activity involved my review of both randomly and strategically selected closed investigation case files to assess whether the law had been properly applied and whether the investigators and their supervisors had correctly followed agency and regional enforcement policy.  I have attached a copy of my current resume, which contains additional information about my experience and qualifications.

**Summary of Prior Expert Testimony**

While with WHD, I testified either at trial or in deposition approximately a dozen times. More recently, as a consultant and expert witness, I have testified twice at trial, once in a hearing and I have given deposition testimony as described below:

*Johnny L. Meadows, et al, v. Latshaw Drilling Company, LLC,* U.S. District Court for the Northern District of Texas, case number 3:15-cv-01173-N.   In this matter I gave deposition testimony and testified at trial.

*Luther Sanders, Individually and On Behalf of Others Similarly Situated v. Latshaw Drilling Company, LLC,* U.S. District Court for the Northern District of Texas, case number 3:16-cv-010093-D.  In this matter I gave deposition testimony.

*R. Alexander Acosta, Secretary of Labor v. Five Oaks Achievement Center, LLC d/b/a Five Oaks Achievement Center, Whispering Hills Achievement Center, LLC d/b/a Whispering Hills Achievement Center and North Fork Education Center, LLC d/b/a North Fork Educational Center,* U.S. District Court for the Southern District of Texas, case number 4:16-cv-3162.  In this matter I gave deposition testimony.

*Bennie R. Weiser, Jr., an individual, and Latrice (Alverson) Weiser, an individual v. Pathway Services, Inc.,* U.S. District Court for the Northern District of Oklahoma, case number 17-cv-673. In this matter I gave deposition testimony and testified at trial.

*Tony Epps, and Matthew Sullivan, for themselves and on behalf of all others similarly situated, Plaintiffs v. Scaffolding Solutions, LLC, Defendant,* U.S. District Court for the Eastern District of Virginia, Norfolk Division, case number 2:17-cv-562.  In this matter I testified in a hearing.

*Sean V.B. Brigida, et al., Plaintiffs v. Ronald C. Valk d/b/a Platinum Construction, et al., Defendants,* U.S. District Court for the Northern District of Texas, Dallas Division, case number 3:18-cv-01443-G.  In this matter I gave deposition testimony.

**Assignment**

I was engaged by attorneys Sim Israeloff and Brian Farrington of Cowles & Thompson PC to provide an opinion on three (3) distinct, but related issues regulated by the provisions of the FLSA and pertinent to this lawsuit.  First, did Defendants provide adequate sleeping facilities for Plaintiffs working shifts of 24 hours or more?   Secondly, did the Defendants have policies and procedures relating to timekeeping which would properly record all hours worked, including interruptions to sleep and the permissible deduction of sleeping time?  And lastly, should Plaintiffs put forward an estimate of damages in this lawsuit, is the estimate properly calculated?

I understand that it is my role as an expert to provide opinions based on my background and specialized experience.  Because of my decades working for WHD and my familiarity with the regulations dealing with hours worked under the Act, I am able to analyze the reported experiences of Plaintiffs and the practices of Defendants with regard to the deduction of certain hours as sleeping time from the 96-hour block of time Plaintiffs were at the Defendants' facility.  As an investigator for WHD I individually conducted at least a dozen FLSA investigations which required me to make such a sleep-time determination on behalf of the Secretary of Labor, and as enforcement director I guided and supervised dozens more such investigations.

To reach my opinions as provided in this report, I have familiarized myself with the legal principles in the Act, the applicable regulations and the enforcement positions taken by WHD,

particularly those addressed in the Division's Field Operations Handbook (FOH) and expressed in opinion letters issued by the agency.

For my work on this matter, I am being paid $215.00 per hour, plus expenses. I have authored no publications in the past 10 years and have worked as a wage and hour consultant for more than six years. I have reviewed numerous documents related to the above referenced litigation as briefly described below:

- Civil Action No. 4:20-cv-00724 (Collective Action)
- Plaintiffs and Consent-Parties Objections & Answers to Defendant Five Oaks Achievement Center, LLC's Interrogatories
- Employee Timecard and Time Sheet forms
- Employee Time Correction Request forms
- Paid Time Off (PTO) Request forms
- Five Oaks Personnel Application form
- Texas Department of Family & Protective Services letter/forms
- Five Oaks Quarterly Evaluation forms
- Five Oaks Cell Phone/Electronic Device Usage Agreement
- Employee Benefit Enrollment form/information
- Mutual of Omaha enrollment forms
- Five Oaks Written Warning form
- Five Oaks Employee Corrective Action Report form

- Five Oaks Change to Employee Pay form

- Personnel Records Orientation form

- North Fork Daily Progress Note (front)

- Summary of Resident's Day (back)

- Staff Notice Regarding Injury

- Five Oaks Injury/Illness Report form

- Five Oaks Incident Report forms

- Five Oaks Sartori form

- Physical Hold log form

- Five Oaks & Whispering Hills Daily Progress Note forms

- Five Oaks Daily House & Safety Check Procedure form

- Five Oaks Shift Change Report form

- Five Oaks Maintenance Request form

- Five Oaks Report Trail form

- Summary of Resident' Day form

- Back Wage Financial System form

- Five Oaks Employee Quick Report form

- Whispering Hills Biweekly Timesheet forms

- Whispering Hills Payroll Summary forms

- Employee Audit Checklist

- Direct Care Staff (DCS) Job Description

- Various emails between Five Oaks staff

- New Hire forms (government)

- Corporate New Hire checklist form

- Texas DFPS Background Check Request forms

- Absence From Duty Request/Report form

- Return To Work form

- Job Injury forms & claim forms

- Employee Training History form

- Employee Confidentiality Agreement form

- Receipt of Employee Handbook form

- Certificate of Completion forms

- Annual Employee Training forms & Sign-in sheets

- Medication Administration Competency Test form

- Medication Administration Documentation form

- Medication Administration Record form

- Five Oaks Employee Handbook

- Five Oaks Policy & Procedures Manual (2018)

- North Fork Policies & Procedures – Employee Handbook (2019)

- Whispering Hills List of Forms required from DCS per Policy & Procedures

- DCS Reporting Chart form

- North Fork Bi-weekly timesheets

- Agreement on Hours Worked form

- Whispering Hills Incident Report form

- Whispering Hills Post Report form

- Whispering Hills Serious Incident Report form

- Whispering Hills Illness & Injury Report form

- Whispering Hills Sartori Containment Report form

- Whispering Hills Post Containment Report form

- Night Shift Watch Log Report form

- Residential Treatment Daily Log form

- Whispering Hills Work Order form

- Intuit Payroll Records

- Time Logix Detailed Time Report forms

- Personnel Record of Orientation & Training

- Job Duties form (Policy & procedures – 2011)

- Texas Department of Public Safety correspondence/forms

- Insurance information/enrollment forms

- Bastrop County Court of Law subpoena (Quinton Robinson)

- Record of Incoming Calls form

- Forms/notes related to staff/supervisor conversations/coaching

- Fair Labor Standards Act of 1938

- WHD Field Assistance Bulletin No. 2016-1

- WHD Field Operations Handbook (FOH) section 31b12

- 29 CFR 785

**Deduction From Hours Worked for Sleep Time**

As referenced above, the regulations regarding hours worked under the FLSA provide rather specific guidance with respect to whether all hours an employee spends at work or at their employer's place of business must be counted and subsequently paid.

Turning to sleep time, 29 CFR 785.20 establishes the rule that some hours an employee spends sleeping at their employer's place of business must be considered compensable hours worked under the Act.  The next section, 785.21 elaborates that if the employee is on duty for less than 24 hours, then all time spent sleeping is considered to be compensable time.  This principle is not applicable to Plaintiffs in this case because they did not work shifts of 24 hours or less.

To the contrary, Plaintiffs, who were direct care staff (DCS) employees of Defendants, worked a schedule of 4 days on duty followed by 4 days off duty, so they clearly were on-duty for 24 hours or more – their duty period consisted of approximately 96 continuous hours.  Regulatory guidance for employees on duty for 24 hours or more is found at 29 CFR 785.22.  The relevant language sets forth the framework to determine compensable hours worked, including time spent sleeping, when such shifts of such length are worked.  Part (a) sets out three general factors which must be present before an employer may consider excluding sleep time from hours worked. The three (3) criteria which must be met are:

1)   An agreement, either express or implied, between the employer and the employee that

a bona fide regularly scheduled sleeping period of not more than 8 hours may be

deducted from hours worked;

During my tenure with WHD this wording allowed for the agreement to be reduced to writing,

but the most common agreement encountered by WHD investigators in the field is an implied

one.  Normally, the individual has applied for employment in a position and has had it

explained to them that they will have a sleep period during their 24 hours (or more) of duty,

the sleeping arrangements are described or shown to the applicant and they are advised that

they will not be paid for time spent sleeping (up to 8 hours).  If the applicant then accepts the

position under the described circumstances, WHD has considered such an implied agreement

to be sufficient to meet this criterion.

In this matter, I found evidence of both an implied and expressed agreement regarding the

deduction of sleep time from Plaintiffs.  Applicants for DCS positions were informed about the

tour of duty (96 hours), the sleeping arrangement possibilities, which varied depending on the

preference of each DCS employee and the house in which they worked, and the sleep time

deduction.  Further, I examined a document called an "Agreement on Hours Worked" which

put the above explanation in writing for the applicant/employee to review.  I found various

versions of this document, but each went beyond explaining the sleep time deduction to give

notice to the applicant/employee of circumstances in which no sleep time deduction would

be made:  "If the sleep period is interrupted to such an extent that the employee cannot get

'a reasonable night's sleep,' which means at least five (5) hours of sleep, then the entire sleep

period is considered working time."  Most, if not all Plaintiffs, signed a version of this

agreement containing similar if not exactly this same language.


Given the practice of giving verbal notice and explanation of the sleep time deduction plus the

provision of the written notice, it's my opinion that this criterion regarding the deduction of

sleep time has been met by Defendants with regard to Plaintiffs.


2)  <u>That adequate sleeping facilities are furnished to the employee by their employer;</u>


I worked for WHD in the administration and enforcement of the FLSA for approximately half of

the agency's years of existence.  Based on my experience with the Division, adequate sleeping

facilities have been historically viewed as facilities minimally necessary for sleep.  That is, WHD

in its enforcement activities determined whether the facilities furnished are such that an

employee may be able to sleep within that setting.  In most instances WHD finds the employee

has been provided a couch to sleep on, or a reclining chair, or an inflatable air mattress, a

standard mattress, a rollaway bed, a cot or bedding material to make a sleeping pallet on the

floor or an elevated flat surface.  If the employee is able to or has been able to sleep under

these arrangements, then the sleeping facilities have been deemed adequate for purposes of

investigations conducted by WHD.  When I visited the facilities relevant to this litigation, I saw

evidence that DCS employed there were provided with each type of sleeping arrangement

noted above, with the exception of a reclining chair.  I learned that DCS sometimes pushed two

large chairs together in opposite fashion to form a flat, cushioned sleeping support which was

off the floor and mobile, being able to be moved to the area of the employee's choice.  Exhibit

1 to this report is a picture of the described chairs as situated in large rooms used by some DCS

for sleeping.  Exhibits 2 and 3 to this report are pictures of mattresses and folding beds utilized

by DCS, and Exhibit 4 is a picture of some of the personal lockers where some DCS stored their

linens.

Certainly, WHD has given consideration to other factors such as proximity of a bathroom, the

lighting (or darkness) of the sleeping area, the noise (or quietness) present in the sleeping area,

etc., because these factors affect the employee's ability to sleep.  But, at the end of the day if it

was determined that most employees are able to sleep in the environment provided by the

employer, then it met the adequacy standard in this section of the regulations.  This is

especially true when the totality of the sleeping facilities is widened to take in proximity of

kitchen and dining space, availability of food and drink, areas for relaxation and TV viewing and

other amenities, such as bathroom access.  Each of these conditions were abundantly met

according to my recent visual examination of the sleeping facilities at Five Oaks, Whispering

Hills and North Fork, just as they were during my site visits in 2018.

In my role directing enforcement activities for WHD, I found it important to be mindful in

interpreting the word "adequate" in section 785.22 of the regulations, that in the section

following, that is 29 CFR 785.23, a much different and more employee-beneficial standard has

been set by WHD for employees who reside on their employer's premises or are there for an extended period of time.  So, for example, an employee who resides at their worksite for 5 nights a week, must be provided with private quarters in a homelike environment, rather than just adequate sleeping facilities.  It is obvious that if WHD so desired, it could engage in a rule-making process to change the "adequate sleeping facilities" requirement at 785.22 which is applicable to Plaintiffs, to provide more comfortable and detailed guidelines, or at least issue a traditional opinion letter or an Administrator's Interpretation intended to interpret the word "adequate" as being something more than minimal.

Currently, WHD's own Field Operations Handbook (FOH 31b12(c)(1)), which provides enforcement guidance to WHD investigators reads, "Whether an employer has provided adequate sleeping facilities to an employee depends on the facts and circumstances of a particular arrangement.  In general, an employer must ensure that the employee has access to basic sleeping amenities, such as a bed and linens, reasonable standards of comfort, and basic bathroom and kitchen facilities.  The designated sleeping area and other facilities can be shared or private."  Defendants provided mattresses, linens and pillows to DCS upon request, although some staff understandably preferred to bring their own linens from home.  While I found some DCS worksites to afford private areas for sleeping, even some behind closed doors, such privacy is not required for sleeping facilities to be adequate, as noted in the FOH section cited above. Exhibits 2 through 6 (in order) of this report picture a sleeping area, mattresses furnished by Defendants to DCS, private lockers provided to DCS, bathroom and kitchen areas in houses where DCS slept and worked – all such amenities are given proper consideration by WHD.

The regulations use of the word "adequate" makes this standard subjective and I recall that even experienced WHD investigators might interpret it differently among themselves. Consequently, it was my practice to steer WHD investigations involving sleep-time issues away from any stance other than interpreting "adequate sleeping facilities" to mean anything other than minimal sleeping facilities, which I believed to be consistent with WHD policy and practice. I was influenced by the fact that employers are permitted to engage in any pay practice which does not clearly violate the Act. Thus, if WHD asserted a violation based on inadequacy of sleeping facilities the agency would be obliged to explain why more detailed or different guidance had never issued to assist employers in their compliance efforts. It is my opinion that this criterion for the deduction of sleep time has been met by Defendants.

3)   <u>The employee can usually enjoy an uninterrupted night's sleep</u>

With regard to whether the employee can usually enjoy an uninterrupted night's sleep, "usually" has in practice been defined by WHD as more often than not. In essence, can the employee or the group of employees performing similar work, enjoy an uninterrupted night's sleep more than half the nights they are on duty? If so, then this criterion is satisfied. It is noteworthy that this section of the regulations regarding "General" guidance provides that for enforcement purposes, "the Divisions have adopted the rule that if the employee cannot get at least 5 hours' sleep during the scheduled period the entire time is working time", 29 CFR

785.22(b).  The scheduled sleep period for Plaintiffs was from 10 PM to 6 AM the following day, an 8-hour period.


Interruptions in General


In order to deduct at least 5 hours of sleep time, the 5 hours during the 10 PM to 6 AM time period should be free from interruption.  In my view, it is very important that the regulations define "interruption" insofar as the FLSA is concerned.  As used in these regulations, an interruption is one caused by a "call to duty".  While call to duty is not defined, in my experience WHD applied the normal meaning of the word and that is a call to perform some aspect of their job duties or the work for which they were employed.  A call to duty for DCS could come from a member of management, their supervisor, a co-worker or from one of the clients for whom they were responsible.  Thus, an interruption would not include insomnia, restlessness, brief awakenings due to light or sound, a bad dream, anxiety, reading, playing on an electronic device or something similar which would not require the DCS to arise and/or perform any work-related activity.   Importantly, the work shift of one or more trained night staff coincided with DCS' sleep period, so that minor issues with clients could be handled by night staff with no interruption to DCS.  Thus, if DCS could usually get 5 hours of sleep during the 8-hour period designated for sleeping without interruption for a call to duty, then WHD would find the deduction for sleep time to be in compliance with the Act.

On the other hand, anytime DCS were interrupted during the sleeping period for a call to duty

and that interruption lasted more than a few minutes, then WHD would require that time,

possibly rounded to the nearest 15 minutes, be counted as hours worked and paid for properly.

WHD considers work of only a few minutes to be de minimis and not compensable. If such

interruptions were so frequent as to prevent DCS from getting a reasonable night's sleep, then

the entire 8-hour period should be counted as work time.  On this subject of frequent

interruptions, I found the notice to DCS provided to them in the "Agreement on Hours Worked"

to be consistent with the language in the regulations with regard to interruptions causing the

entire sleep period to be compensable.  To me, this was an indication of Defendant's intention

to comply with the Act's sleep time requirements.


During the course of an investigation by WHD regarding the sleep time regulations, based on

my experience, if the three (3) factors in 785.22(a) appeared to be minimally satisfied, the focus

of the investigation shifted to part (b) of 785.22, which requires the employee to be paid for

call-to-duty interruptions during the sleeping period.  In the vernacular part (a) seems favorable

to the employer, but part (b) is clearly favorable to the employee.  Satisfaction of the

requirements in part (a) meant the employer could deduct sleeping time, but also had to

compensate employees for interruptions to that sleeping period.  The typical violation WHD

asserted in these types of investigations resulted from an employee having their sleep time

interrupted by a call to duty for which they had not been compensated.  Given the presence of

night staff at Defendants' facilities, the need to interrupt DCS during their sleep period

appeared unlikely, but it did occur.  The matter necessitating such an interruption would trigger

the requirement that DCS complete incident-related forms which would link to the completion and submission of time correction reports.

<u>Interruptions at Defendant's Establishments</u>

Due to the nature of Defendant's business, that is the care, education and housing of troubled children and youth with oversight of State authorities, recordkeeping of all sorts is a must.  This was particularly true of DCS, who had the most contact with clients/residents and were primarily responsible for them, at least during hours from 6 AM to around 8 PM.  For example, DCS completed a "Daily Progress Report" which accounted for the daytime activity, behavior, interaction/intervention with and comments on each client/resident.  The back of the form provided for a "Summary of Resident's Day" and a "Night Report".  Since this litigation focuses on hours between 10 PM and 6 AM the following day, I paid those hours special attention.

I found DCS are scheduled to give medication to residents at 7 PM each day.  Practically every resident takes medication as a sleeping aid, so by 8 PM most, if not all residents are sound asleep.  Consequently, DCS are afforded the two hours from 8 PM – 10 PM to complete the paperwork required of them.  Each DCS is responsible for up to 5 residents, but sometimes it's more like 3 or 4 residents.  The scheduled sleep period for DCS begins at 10 PM and that generally coincides with the arrival of the night shift employee or employees at each house.  I noticed that when night shift staff was late arriving there was a time correction form completed by DCS to claim hours worked after 10 PM.

Simply stated, the night shift employees are hired to and trained to handle minor issues with residents during the residents' sleep period.  One (or more) night staff take over and DCS can arrange themselves on a couch, cot, mattress, arrangement of chairs or pallet and go to sleep for the night, until 6 AM the following day when they go back on duty.  The night report section of the Daily Progress Report appeared to result from a collaboration of DCS and night staff – this report was to be submitted by DCS no later than 9 AM the following day.

Given allegations made by Plaintiffs in this matter with regard to incidents at night causing them to be interrupted during their sleep period, I reviewed dozens of incident reports generated by Plaintiffs.  Actually, I believe I reviewed all such reports relative to the time period covered by this lawsuit.  I found that many, if not a large majority of such reports, regarded incidents which occurred outside the sleep period of DCS.  That is the incident reported happened between the hours of 6 AM and 10 PM, often around hygiene time in the morning or evening, at mealtime, during recreation time, TV-viewing time or medication-dispensing time.  I was struck by how few reported incidents occurred between the hours of 10 PM and 6 AM.  Indeed, I found reported incidents that happened during DCS sleep time and such night-time incidents appeared to be significant and sometimes time consuming.  However, I followed the paper trail in a representative sample to find such incidents/interruptions had been the subject of an Employee Time Correction form which caused the additional hours to be captured in Defendants' time records and paid for correctly.

During the course of my work on this matter, I spoke with individuals like Michael Eckenrode and Darryl Ashford who worked as DCS for many years prior to getting into management.  I also examined many of the various forms that DCS are required to complete.  Forms covering incidents, serious incidents, injury, illness, safety, cleanliness of the house, intervention, containment and hours worked.  Those conversations helped me to understand how each house was managed and operated during night-time hours.  Although DCS were not to leave their assigned house during the night, the staffing was such that they could be completely relieved of their duties with regard to the residents and use the time from 10 PM to 6 AM the following day for their own purposes, particularly to get the sleep they needed.

Again, due to the nature of this work with children and youth, night staff physically position themselves just outside the bedrooms of residents and are responsible for almost all duties related to them.  In other words, night staff watch over residents and note any illness, behavioral issues or even restlessness during the night.  Only behavioral issues or illness would require night staff to awaken DCS and when that happens there are requisite forms to be completed.  And, clearly those are interruptions consisting of a call to duty for the DCS.  Further, DCS is instructed to complete an "Employee Time Correction Request" form which permits them to report any hours worked due to interruptions to their sleep period, including an event such as an attempted runaway which could cause the entire sleep period to become compensable as hours worked.

It is the fact that call-to-duty interruptions require the completion of documents/reports by DCS and night staff that cause me to believe such interruptions have been made a matter of record.  It appears to me that allegations by Plaintiffs that interruptions to their sleep period occurred are true.  But, equally true it appears that when such interruptions occurred, DCS and/or night staff were obligated by Defendant's policy and procedures if not by State law, to complete documents related to the cause of such interruptions.  I reviewed numerous records indicating DCS worked during a portion of their sleep time, such as when night staff arrived late or not at all, or when a resident had to be dealt with regarding a behavioral issue.  I followed this paper trail to see that an Employee Time Correction Report was completed/submitted and the DCS employee was paid properly for this time and that included proper overtime at a time and one-half rate when DCS worked over 40 hours in a workweek.  I found no incidents where DCS reported working more than 40 hours and those overtime hours were not compensated at the required overtime rate called for in the FLSA.

Consequently, with respect to the second issue within my assignment – did Defendant have policies and procedures regarding timekeeping which would properly record all hours worked by Plaintiffs including interruptions to sleep – in my opinion the answer is yes.  And I would add that based on documents I examined, DCS and night staff followed Defendant's policies in this regard, completed the requisite forms and that Defendant has preserved them.  If Plaintiffs failed to complete the prescribed incident-reporting forms or other forms indicating they worked during their scheduled sleep period, then I am as uninformed and unknowing with regard to my review of such matters as Defendants would have been at the time.

**Estimate of Damages**

The third potential phase of my assignment regards my review of and opinion about any estimate of damages put forward by Plaintiffs in this matter.  At the time of this report I have not been furnished with any such estimates, but I reserve the right to revise my report to include such work and opinion should estimates be received from counsel.

**Summary**

Consistent with my assignment in this engagement, I have considered whether Defendants provided adequate sleeping facilities for DCS employees.  I traveled to each of the 3 facilities, Five Oaks, Whispering Hills and North Fork to personally view the houses and the varying manner in which they are laid out.  I also viewed the furniture, some mattresses, sleeping tents (for lack of a better description), bedding, linens and so forth.  If I were still with WHD my opinion would be the same as it is now as a consultant - the sleeping facilities furnished in every instance were adequate under the FLSA.

Additionally, I would conclude that DCS employees employed by Defendants' experienced interruptions to their bona fide sleep periods – Defendant's own records show this to be true.

Notably, the Agreement on Hours Worked provided to prospective DCS employees and often

signed in acknowledgement, puts the issue of deductions for sleep time front and center for the

applicant/employee, as well as articulating the regulatory rule that they will be compensated

for interruptions.  Given this Agreement and related information furnished in the Employee

Handbook and in training sessions, it seems almost impossible for DCS to not understand

Defendant's policies on sleep time deductions.  Further, the Employee Time Correction Report

form provides the vehicle by which DCS can report hours worked outside their normal schedule,

including interruptions during sleep periods.  Finally, the myriad reports DCS had to complete

regarding events which interrupted their sleep period make is difficult to see how hours worked

during sleep periods could have gone unreported by the employee and unpaid by Defendant.  I

found no evidence that such instances had occurred, but I am experienced enough to

understand that after their employment by Defendants long since ended, a DCS could allege

they experienced an interruption or call to duty during a sleep period and simply did not follow

policy and in fact did not complete any of the reports that would have put Defendants on

notice that an interruption had occurred.  More likely, I believe Plaintiffs may not fully

understand that the regulations regarding hours worked and the sleep period deduction

contain a specific definition of interruption, that being a call to duty.


As noted above I have not been furnished with any damages estimates from Plaintiffs.  Should

they be received I would supplement this report to opine on their correctness.  Discovery

continues in this matter, so I reserve the right to make amendments and revisions to this

report.  The evidence I have seen and the information I have considered lead me to the opinion

As noted above I have not been furnished with any damages estimates from Plaintiffs.  Should

they be received I would supplement this report to opine on their correctness.  Discovery

continues in this matter, so I reserve the right to make amendments and revisions to this

report.  The evidence I have seen and the information I have considered lead me to the opinion

that Defendants provided adequate sleeping facilities to Plaintiffs.  Defendants had policies,

procedures and forms, which if followed and utilized properly, and I saw no evidence that they

were not followed, would have resulted in the accurate counting of all hours worked by

Plaintiffs.  Further, the timekeeping system utilized by Defendants with input from Plaintiffs and

other DCS appears to have properly counted all hours worked as required by the Act.

Respectfully submitted,

*Randall G. O'Neal*

Randall G. O'Neal

Wage and Hour Consultant

Attachment:  Resume

Exhibits

**Randall G. ( Randy) O'Neal**
1410 O Shannon Lane, Garland, TX  75044

972.983.3364                                                      rgoneal50@hotmail.com

<u>Professional Summary</u>

Wage and Hour Consultant              2015 - Present
Garland, Texas

Provide advisory and consulting services related to compliance with the Fair Labor Standards Act (FLSA) including exempt vs non-exempt determinations, federal prevailing wage requirements under the Davis-Bacon Act and the Service Contract Act, and other federal statutes.  Provide training to client's managers and employees regarding compliance with federal labor laws and assistance with respect to investigations by the Wage and Hour Division of the U.S. Department of Labor.  Conduct compliance audits to assist clients and counsel in assessing risk related to current employment practices and formulating steps to effect full compliance.  Assist plaintiff and defense attorneys with respect to opinions and expert testimony.  Over 40 years of DOL experience including 20 as head of enforcement in one of five federal regions.

Regional Director of Enforcement       U.S. Department of Labor 2004-2015 (retirement)
Southwest Regional Office, Dallas, TX   Wage and Hour Division (WHD)

Responsible for enforcement of all Acts administered by WHD in an 11-state area, in essence supervising the conduct of the thousands of investigations carried out by more than 200 wage and hour investigators.  Directed management review of enforcement activities, identified and resolved technical and procedural issues in the 11 district offices and reviewed systemic factors related to program effectiveness.  Served as operational link between WHD and the Regional Solicitor of Labor.  Served on the National Enforcement Policy Advisory Committee and served as Criminal Enforcement Coordinator.

Director of Regional Operations        U.S. Department of Labor     1994-2004
Southwest Regional Office, Dallas, TX   Wage and Hour Division

Performed the same duties and had the same responsibilities regarding enforcement as the director of enforcement position which was created in 2004.  Additionally, supervised all staff in the regional office except those working directly for the regional administrator, including staff handling the prevailing wage surveys; back wage disbursements, civil monetary penalties, program analysis and all enforcement related matters.  In 2000 was named the Regional Manager of the Year.

Director of Government Contract Enforcement      U.S. Department of Labor 1990-1994
Dallas Regional Office                  Wage and Hour Division

Supervised all enforcement work related to enforcement of the Davis-Bacon Act, the Davis-Bacon Related Acts, the Service Contract Act and the Contract Work Hours and Safety Standards Act.  Also supervised the conduct of all prevailing wage surveys carried out with regard to the Davis-Bacon Act in a 5-state area until 1994 when the area was expanded to include 11 states.

Wage and Hour Investigator      U.S. Department of Labor     1977-1990
Tulsa District Office            Wage and Hour Division

Dallas District Office                                1975-1977

Independently conducted a wide range of investigation under all Acts administered and enforced by the WHD.  In 1987 received the Department of Labor Distinguished Career Service Award.  Handled numerous complex investigations that were ultimately litigated by the DOL, specialized in government contract law investigations and was detailed to several Federal installations such as the Johnson Space Center (NASA) to individually handle extremely sensitive cases.  In 1983 named the Federal Employee of the Year by the Tulsa Federal Executive Association.

<u>Education</u>

BS in Business Administration
Oklahoma State University - 1972

# EXHIBIT 1




# EXHIBIT 2




# EXHIBIT 3




# EXHIBIT 4



# EXHIBIT 5



# EXHIBIT 6




# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **DEVERY DAVIS and CLIFTON** | § | **CIVIL ACTION NO. 4:20-cv-00724** |
| **HUMPHREY, INDIVIDUALLY AND** | § | |
| **ON BEHALF OF ALL OTHERS** | § | |
| **SIMILARLY SITUATED,** | § | |
| | § | |
|     **Plaintiffs** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **FIVE OAKS ACHIEVEMENT** | § | **COLLECTIVE ACTION** |
| **CENTER, LLC d/b/a FIVE OAKS** | § | |
| **ACHIEVEMENT CENTERS;** | § | |
| **WHISPERING HILLS ACHIEVEMENT** | § | |
| **CENTER, LLC d/b/a WHISPERING** | § | |
| **HILLS ACHIEVEMENT CENTER; and** | § | |
| **NORTH FORK EDUCATIONAL** | § | |
| **CENTER, LLC d/b/a NORTH FORK** | § | |
| **EDUCATIONAL CENTER** | § | |
| | § | |
|     **Defendants.** | § | |

**PLAINTIFFS AND CONSENT-PARTIES' OBJECTIONS AND ANSWERS TO
DEFENDANT FIVE OAKS ACHIEVEMENT CENTER, LLC'S INTERROGATORIES**

**TO:    DEFENDANTS FIVE OAKS ACHIEVEMENT CENTER, LLC; WHISPERING
HILLS ACHIEVEMENT CENTER, LLC AND NORTH FORK EDUCATIONAL
CENTER, LLC, by and through their attorneys of record, Brian T. Farrington
(bfarrington@cowlesthompson.com) and Sim Israeloff,
(sisraeloff@cowlesthompson.com), Cowles & Thompson, P.C., 901 Main Street,
Suite 3900, Dallas, Texas 75202 Telephone No. 214.672.2000**

Plaintiffs and Consent Parties serve the following objections and answers to Defendant

Five Oaks Achievement Center, LLC's Interrogatories in accordance with Federal Rules of Civil

Procedure.

Respectfully submitted,

**WASHINGTON & ASSOCIATES, PLLC**

By:      /s/ *Mickey L. Washington*
                   **MICKEY L. WASHINGTON**
                   Federal Bar No. 35786
                   mw@mickeywashington.com
                   **KIMBERLY R. BENNETT**
                   Federal Bar No. 32123
                   kbennetttx@earthlink.net
                   2019 Wichita Street
                   Houston, Texas 77004
                   Telephone#713.225.1838
                   **ATTORNEYS FOR PLAINTIFFS**
                   **AND OTHERS SIMILARLY**
                   **SITUATED**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on Defendants, by and through their attorneys of record, on March 22, 2021, via email, facsimile, first class mail and/or certified mail, return receipt requested as follows:

**COWLES & THOMPSON, P.C.**

**Brian T. Farrington**
Texas Bar No. 00790667
**Sim Israeloff**
Texas Bar No. 10435380
901 Main Street, Suite 3900
Dallas, Texas 75202
Telephone#:  214.672.2000
Email Address:  bfarrington@cowlesthompson.com
Email Address:  sisraeloff@cowlesthompson.com

**Attorneys for Defendants**

                       /s/ *Mickey L. Washington*
                       **MICKEY L. WASHINGTON**

## INTERROGATORIES

**INTERROGATORY NO. 1:** Please provide the name, address and telephone number of each individual likely to have discoverable information – along with the subject of that information and a summary thereof – that the Plaintiffs may use to support each of their claims.

**ANSWER:** Objection.  Plaintiffs and Consent Parties object to this interrogatory because it seeks the substance of knowledge held by each such person, which is beyond the scope of Rule 26 of the Federal Rules of Civil Procedure, and is overly broad, unduly burdensome and requires speculation.  Such detailed information may be properly sought by deposition.  Subject to and without waiving the forgoing objections, Plaintiffs and Consent Parties answer as follows: see Initial Disclosure Responses produced on behalf of Plaintiffs and Consent Parties.  The parties will supplement pursuant to Texas Rules of Civil Procedure.

**INTERROGATORY NO. 2:** Please identify with specificity each instance in which you allege that any Defendant violated the Fair Labor Standards Act, describing each instance in detail.

**ANSWER:** Objection. Plaintiff objects to this interrogatory because it seeks information that is beyond the scope of Rule 26 of the Federal Rules of Civil Procedure, and is overly broad, unduly burdensome and may require speculation.  Such detailed information may be properly sought by deposition.  Subject to and without waiving the forgoing objections, Plaintiffs and Consent Parties answer as follows:  See Initial Disclosure Responses produced on behalf of Plaintiffs and Consent Parties.  In addition to the disclosure responses, Plaintiffs and Consent Parties respond as follows:

Devery Davis: I worked a weekly rotation working 4 days on 4 days off. Early on I would sleep in my truck because there was no privacy from the residents. Later, I brought my own supplies of sheets and folding bed to sleep on. Eventually we got beds like tents, but we still had to do paperwork at night sometimes.  Also, the residents would go to the kitchen in the middle of the night or the restroom, which would wake me up. On many occasions, the boys may get into fights, and try to escape.  We would consistently have to go search for them. My sleep was always interrupted.

Clifton Humphrey: I was employed approximately 6 years, we worked weekly rotations as 4 days on and 4 days off. On my shifts, we slept out in the opening on the sofa where the residents had unfettered direct access to me and other staff. We were interrupted by doors being opened consistently, lights consistently being turned on, and boys trying to run away from the facility in the middle of the night. We also had to intervene because the one female night staff person could not keep up with the boys. Other behavior issues with the residents caused my sleep to be interrupted.

Gordon Leung Lo-Hin: I worked 4 days on at a time with 16 hours on and 8 hours off. There were always issues with coverage-having enough staff for the needs involved, at times I worked weeks straight. I slept on a living room mattress. I was constantly awoken at night with kids who were sexually acting out, running away, fighting or sick. The night staff was not trained to provide medication or handle the issues, so they would wake the kids up. We were awoken on a

regular basis nightly for some type of issue, and during the day we were not allowed any breaks, not even for meals.

Christopher Marchiniak: My duties included teaching living skills to the residents, educating the lower functioning residents in CPS custody and managing violent behaviors. I worked 4 days on and 4 days off. I slept on the floor in the main living area mostly on a sofa where residents would disturb us throughout the night. The facility had a filthy air mattress, which deflated through the night, so we had to sleep on the floor.  Sleep was interrupted by the night shift turning on lights and checking on residents, runaways, and kids waking up. The interruptions were frequent and become the norm.

Jermon Randolph: I worked 4 days on 4 days off on the night shift. The residents or the night staff would wake us up all the time with fights, residents going to restroom, arguing, and trying to escape. The facility was not fit or suitable for sleeping.  The facility was infested with rodents, roaches and bed bugs.  In addition, there was no quiet place to get rest.  On occasions, when the air conditioner would go out, we were forced to slept in the gym with the residents.

Quenton Robinson: I worked 4 days off and 4 days on at 16 hour days. We did not have beds, so we slept on the floors or in chairs or on the couch. We were constantly interrupted during the night by the residents the entire time I was employed. We shared a living area with the residents, so staff would sleep there without bedding sheets. Mattresses may have blood, and a bad odor from people with poor hygiene or lack of showering.

**INTERROGATORY NO. 3:** Please identify with specificity each and every instance in which you alleged any Defendant failed to provide adequate sleep facilities for any of their employees and the basis for your belief, describing each instance in detail and identifying the Defendant with particularity.

**ANSWER:** Objection. Plaintiff objects to this interrogatory because it seeks the detailed substance of knowledge held by each such person, which is beyond the scope of Rule 26 of the Federal Rules of Civil Procedure, and is overly broad, unduly burdensome and requires speculation. Such detailed information is properly sought by deposition.  Subject to and without waiving the forgoing objections, Plaintiffs and Consent Parties answer as follows: See Initial Disclosure Responses produced on behalf of Plaintiffs and Consent Parties; see also, Plaintiffs and Consent Parties' Answer to Interrogatory No. 2.

**INTERROGATORY NO. 4:** Please identify with specificity each and every instance in which you allege any Defendant failed to ensure that its employees received five hours of uninterrupted sleep each night and the basis for your belief, describing each instance in detail and identifying the Defendant with particularity.

**ANSWER:** Objection. Plaintiff objects to this interrogatory because it seeks the detailed substance of knowledge held by each such person, which is beyond the scope of Rule 26 of the Federal Rules of Civil Procedure, and is overly broad, unduly burdensome and requires speculation. Such detailed information is properly sought by deposition.  Subject to and without waiving the forgoing objections, Plaintiffs and Consent Parties answer as follows: See Initial

Disclosure Responses produced on behalf of Plaintiffs and Consent Parties; see also, Plaintiffs and Consent Parties' Answer to Interrogatory No. 2.

**INTERROGATORY NO. 5:** For each plaintiff and consent-party, identify by dates and hours worked all hours for which you allege you were not paid in full other than for hours that were deducted for designated sleep time (if any). Please be specific.

**ANSWER:** Objection. Plaintiff objects to this interrogatory because it seeks the substance of knowledge held by each such person, which is beyond the scope of Rule 26 of the Federal Rules of Civil Procedure, and is overly broad, unduly burdensome and requires speculation. Such detailed information is properly sought by deposition.  Subject to and without waiving the forgoing objections, Plaintiffs and Consent Parties answer as follows: Each Plaintiff and Consent Party allege they were not paid in full because hours were deducted for sleep for the duration of their employment as disclosed in their consents.  For the reasons specified in these answers and the petition, such hours should not have been deducted.  The Parties will provide more detailed information as discovery continues.

**INTERROGATORY NO. 6:** For each plaintiff and consent-party, identify by dates and hours worked all hours for which you allege you were not paid in full due to deductions for designated sleep time. Please be specific.

**ANSWER:** Objection. Plaintiff objects to this interrogatory because it seeks the substance of knowledge held by each such person, which is beyond the scope of Rule 26 of the Federal Rules of Civil Procedure, and is overly broad, unduly burdensome and requires speculation.  Such detailed information is properly sought by deposition. Subject to and without waiving the forgoing objections, Plaintiff and Consent Parties answer as follows: see Answer to Interrogatory No. 5 above.

**INTERROGATORY NO. 7:** For each plaintiff and consent-party, describe the sleeping facilities you were provided while working for Five Oaks. Please be specific and include in your answers what kind of bedding (mattress, couch, etc.) you were provided, the bathroom facilities (staff only, etc.) and the location(s) within the facility where you were allowed to sleep.

**ANSWER:** Objection. Plaintiff objects to this interrogatory because it seeks the substance of knowledge held by each such person, which is beyond the scope of Rule 26 of the Federal Rules of Civil Procedure, and is overly broad, unduly burdensome and requires speculation.  Such detailed information is properly sought by deposition.  Subject to and without waiving the forgoing objections, Plaintiffs and Consent Parties answer as follows: see Answer to Interrogatory No. 2 above.

**INTERROGATORY NO. 8:** For each plaintiff and consent-party, describe what you allege Five Oaks was supposed to provide to you to constitute "adequate sleeping facilities." Please be specific and include in your answer all criteria and standards you claim Five Oaks was required to meet.

**ANSWER:** Objection. Plaintiff objects to this interrogatory because it seeks the substance of knowledge held by each such person, which is beyond the scope of Rule 26 of the Federal Rules of Civil Procedure, and is overly broad, unduly burdensome and requires speculation. Such detailed information is properly sought by depositions. Subject to and without waiving the forgoing objections, Plaintiffs and Consent Parties answer as follows: An environment that would allow for a semblance of privacy such as a separate place or quarters to sleep away from the routine disturbances and interruptions that normally and regularly ensued from the young residents of the respective facilities involved. A dark quiet, closed off place with recliners, clean cots or clean beds with clean mattresses free of rodents, roaches and bed bugs was desired and would have provided for an opportunity to get rest and be alert for duty time. Because of the disturbances and interruption complained of in Interrogatory No. 2 above, the Plaintiffs and Consent Parties contend they were not able to get adequate rest, and therefore, it is unreasonable and unfair for them to not have been compensated at the expense of the employer who deducted the time they should have been paid pursuant to the FLSA.

**INTERROGATORY NO. 9:** For each plaintiff and consent-party, identify all instances in which you complained or notified Five Oaks that you were working hours for which you were not being paid. Be specific and include in your answer the date(s) of each complaint or notice you gave, the person(s) to whom you complained or gave notice, and what specifically you said or gave notice of.

**ANSWER:** Objection. Plaintiff objects to this interrogatory because it seeks the substance of knowledge held by each such person, which is beyond the scope of Rule 26 of the Federal Rules of Civil Procedure, and is overly broad, unduly burdensome and requires speculation. Such detailed information is properly sought by deposition. Subject to and without waiving the forgoing objections, the parties will supplement.

**INTERROGATORY NO. 10:** For each plaintiff and consent-party, identify each instance in which you allege that you did not receive at least five hours of uninterrupted sleep each night. Please be specific and include for each date and the reason you did not received at least five hours of uninterrupted sleep that night.

**ANSWER:** Objection. Plaintiff objects to this interrogatory because it seeks the substance of knowledge held by each such person, which is beyond the scope of Rule 26 of the Federal Rules of Civil Procedure, and is overly broad, unduly burdensome and requires speculation. Such detailed information is properly sought by deposition. Subject to and without waiving the forgoing objections, Plaintiffs and Consent Parties answer as follows: see Answers to Interrogatory No.(s) 2 and 8 above.

**INTERROGATORY NO. 11:** For each plaintiff and consent-party, provide detailed computations of all back wages you assert are due to each current or former employee for which you bring this suit, including the data upon which the computations were based, the workweek date(s) for which computations are made, and any assumptions relevant to the computations.

**ANSWER:** Objection. Plaintiff objects to this interrogatory because it seeks the substance of knowledge held by each such person, which is beyond the scope of Rule 26 of the Federal Rules

of Civil Procedure, and is overly broad, unduly burdensome and requires speculation.  Such detailed information is properly sought by deposition.  Subject to and without waiving the forgoing objections, Plaintiffs and Consent Parties answers as follows: See Answer to Interrogatory No. 5 above.  The parties will supplement as discovery progresses.

**INTERROGATORY NO. 12:** For each person you may call as an expert, please state his or her full name, educational background, other training experience of knowledge which qualifies him or her as an expert, residential and business address, occupation and employer, and the subject matter upon which each such expert witness is expected to testify and a summary of the grounds for each opinion which it is expected will be given.

**ANSWER:** Objection.  Plaintiff objects to this interrogatory because it seeks information that must be produced in accordance with Federal Rule Civil Procedure 26. Subject to and without waiving the forgoing objection, Plaintiffs and Consent Parties answer as follows: Plaintiffs and Consent Parties will supplement in accordance with the Court's Scheduling Order.

# Exhibit 4

DECLARATION OF RANDALL BRYANT

Pursuant to 28 U.S.C. § 1746 Randall Bryant states as follows:

l.      My name is Randall Bryant.  I am over twenty-one (21) years of age, have never been convicted of a felony or other crime involving moral turpitude, and suffer from no mental or physical disability that would render me incompetent to make this Declaration.  I am able to swear, and hereby do swear, that all of the facts stated in this Declaration under penalty of perjury are true and correct and within my personal knowledge or are known to me through my duties and responsibilities at Five Oaks Achievement Center, LLC, Whispering Hills Achievement Center, LLC, and North Fork Educational Center, LLC. (collectively "Five Oaks.")


2.      As more fully discussed below, Five Oaks investigated and had a reasonable and good faith belief that the 8-hour sleep time deduction at issue in this case complied with the law. Five Oak's good faith belief included its reliance on the advice of legal counsel.


3.      I worked for the Five Oaks enterprise from 4/01/2002 - 08/11/2013. During my tenure I was a DCS, a Shift Supervisor, a Licensed Child Care Administrator (LCCA), and became Executive Director of the Five Oaks location. This was the position I held in August, 2008. Effective January 3, 2012, I became Chief Operating Officer (COO) of all locations in the Five Oaks enterprise, while also remaining Executive Director at the Five Oaks location. It was always my intention as Executive Director and as COO to comply with the Fair Labor Standards Act ("FLSA"), as well as all other applicable laws, and this was the intention of Five Oaks as an enterprise.

4.      In or about 2008, I was aware that the minimum wage had increased to $5.85 per hour in July of 2007; went up to $6.55 per hour effective July, 2008; and would go to $7.25 per hour in July, 2009. Since our employees were working 24 hours per day, these increases would result in a big increase in our labor costs. I wanted to explore ways in which I might comply with the wage and hour law but still offset the increased labor costs.

5.      As part of this process, I and some of the other staff members investigated the legal requirements and options available to Five Oaks. We sought out conferences from the Texas Workforce Commission on wage and hour issues. We also asked other residential treatment centers their thoughts on the issues and how to keep up the requirements of the FLSA and wage and hour issues. Every year I and some of the Five Oaks staff attended the Texas Administrator's Licensed Childcare Conference (TALCC) and/or other conferences on wage and hour compliance issues. Among the TALCC presentations were sessions on compliance with the FLSA.

6.      In August of 2008, Five Oaks engaged labor and employment attorney Brian T. Farrington to provide us with advice on the topic of deducting sleep time for employees on 24-hour duty.  Mr. Farrington came to our offices on or about August 28, 2008. He toured the facilities, met and talked with staff from two shifts, looked at our time and payroll records, reviewed some proposed time sheets, and advised us on whether and how we could lawfully implement an 8-hour sleep time deduction for employees on duty for 24-hour shifts. I personally, and Five Oaks as an enterprise, relied on his advice.

7.      Mr. Farrington drafted an agreement for the workers to sign in which they would agree that they were provided with adequate sleeping facilities, that the period from 10 pm to 6 am was a designated sleeping period, and that if there were no interruptions during this sleeping period, 8 hours would be deducted from the employees' total hours worked for that day. The agreement also said that if an employee was interrupted by a call to duty during the sleeping period, the elapsed time of the interruption will be counted as compensable hours of work and that the employee must document the additional compensable hours on their time sheet. We added some language to this draft about paid time off, the workweek, and overtime, and in reliance on Mr. Farrington's advice I implemented this agreement with Five Oaks' employees.

8.      I do not recall any concerns raised by Mr. Farrington about the adequacy of sleeping facilities. Mr. Farrington saw our facility in Richmond, diagrams of other facilities, and was aware of the fact that employees slept on mattresses on the floor, and he did not say that such facilities were not adequate. If he had, I would have implemented whatever changes he recommended.

9.      I have attached to this Declaration the following documents, which I certify are true and correct copies of Five Oaks' business records. I was one of the custodians of Five Oaks' records. The attached pages of records are kept by Five Oaks in the regular course of business, and it was the regular course of business of Five Oaks for an employee or representative of Five Oaks, with knowledge of the act, event, condition, opinion, or diagnosis, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the original:

a. An email sent August 25, 2008 at 1:08 pm from me to Craig Bibb, with a copy to Roxann Voyles, concerning Brian Farrington's visit scheduled August 28, 2008.

b. An email sent August 25, 2008 at 3:08 pm from me to Brian Farrington, with a copy to Craig Bibb, in which he discusses the upcoming visit from Mr. Farrington, and transmits two time sheets which he had created to record interruptions to sleep time in anticipation of our converting to the system under which we were to establish a sleep time period and deduct sleep time from hours worked.

c. One of the two forms created by me and transmitted to Mr. Farrington in the above email. The form is entitled "Direct Care Staff- Night Time Hour Log."

d. The other of the two forms, entitled "Direct Care Staff Time Sheet."

e. The "Agreement on Hours Worked" originally drafted by Mr. Farrington to which I referred in paragraphs 5 and 6 of this Affidavit, above.

f. A two-page "Bill" showing that on I0/11/2008, Five Oaks Achievement Center, LLC, paid $1,856.00 to the Law Office of Brian T. Farrington. The Five Oaks "Account" for this payment was "Legal Fees," and the "Memo" entry was "regarding payroll."

10. I relied on Five Oaks and my investigation into FLSA compliance, and on Mr. Farrington's investigation and advice, in implementing the 8-hour sleep time deduction in 2008.

11.     From the time we implemented the sleep time deduction pay system in 2008 until the time

I left Five Oaks' employ, I believed Five Oaks was in full compliance with the FLSA.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 21, 2021.

/s/ Randall Bryant_____

# EXHIBIT A

**Farrington, Brian**

| | |
|---|---|
| **From:** | Jerry Bibb [chip_1159@yahoo.com] |
| **Sent:** | Wednesday, February 21, 2018 8:36 AM |
| **To:** | Farrington, Brian; Stapleton, Stephen; Roxanne Voyles |
| **Subject:** | Fwd: Brian Farrington's info |

Brian,

Here's the email from 2008....you came out and met with both shifts about the staff agreement and for the hours worked vs the 8 hours of sleep.

Craig Bibb

Begin forwarded message:

> **From:** Randall Bryant <randallbryant@sbcglobal.net>
> **Date:** August 25, 2008 at 1:08:18 PM CDT
> **To:** chip_1159@yahoo.com
> **Cc:** Roxann Voyles <roxannvoyles@sbcglobal.net>
> **Subject: Re: Brian Farrington's info**
>
> Bibbster,
>
> The meeting is Thursday starting at 7 am.  The reason we will need to start so early is so that we can do the incoming group first and then switch them out.  They come in at 7 and this will help us get the departing staff out of here asap.  Should I come over there Wednesday so that me, you, and Rox came assure that we are on the same page.  It wouldn't be a big deal or bother me one bit to come over.
>
> ----- Original Message ----
> From: Jerry Bibb <chip_1159@yahoo.com>
> To: Randall Bryant <randallbryant@sbcglobal.net>
> Sent: Monday, August 25, 2008 12:50:02 PM
> Subject: Brian Farrington's info
>
> Randall,
>
> Here it is.........let me know when the meeting is.....Rox will be joining us!
>
> Craig
>
> Brian Farrington
> BTFJD@aol.com

1

# EXHIBIT B

**Farrington, Brian**

| | |
|---|---|
| **From:** | Jerry Bibb [chip_1159@yahoo.com] |
| **Sent:** | Tuesday, February 20, 2018 5:06 PM |
| **To:** | Farrington, Brian; Stapleton, Stephen; Darryl Ashford |
| **Subject:** | Fwd: Five Oaks time sheets |
| **Attachments:** | Five Oaks Achievement Center Awake Night Hours.docx; ATT00001.htm; Five Oaks Achievement Center direct care staff time sheets.docx; ATT00002.htm |

FYI

Craig Bibb

Begin forwarded message:

> **From:** Randall Bryant <randallbryant@sbcglobal.net>
> **Date:** August 25, 2008 at 3:08:29 PM CDT
> **To:** brain farrington <BTFJD@aol.com>
> **Cc:** craig bibb <chip_1159@yahoo.com>
> **Subject: Five Oaks time sheets**
>
> Brian,
>
> Hope all is well.  Please review the following time sheets (documentation of night hours and shift sign in sheets) that I have created.  I tried to keep these as simple and easy as I could, for reasons we discussed, while assuring that I have the proper documentation to keep five oaks safe.  Please let me know if these documents are sufficient and offer any suggestions that you may have.  We plan to have our meeting with the staff on Thursday morning at 7 am.  It would be extremely beneficial to have those documents that you were going to provide for us during that meeting.  You could email or fax them to me if that would help you get them to us by Wednesday so that we could review them.  Let me know if you need anything. (713) 857-8968
>
> Thank you,
>
> Randall Bryant
> Five Oaks Achievement Center

# EXHIBIT C



# Five Oaks Achievement Center

## Direct Care Staff - Night Time Hour Log

Name of Direct Care Staff: _____

Date: _____ / _____ / _____

Time Work Started: _____ am / pm

Time Work Ended: _____ am

Total Time Worked: _____

Client(s) Awake Staff Responsible For: _____

Brief Description of Behavior Necessitating Awake Staff: _____

_____

_____

_____

_____

Signature of Supervisor Notified: _____

# EXHIBIT D



# Five Oaks Achievement Center

## Direct Care Staff Time Sheet

**Scheduled Shift Days:**

Date in: _____ / _____ / _____

Date out: _____ / _____ / _____

**Date(s) absent from Scheduled Shift (vacation-sick):**_____

**Additional /Extra Day(s) Worked:**

Date Worked: _____ / _____ / _____

Date Worked: _____ / _____ / _____

Date Worked: _____ / _____ / _____

Date Worked: _____ / _____ / _____

**\*\*Employees will work and be paid for a 16 hour work day. As agreed upon by Five Oaks Achievement Center and its Direct Care Staff, employees will not be paid for the hours that they sleep. The designated sleep time will be between the hours of 10 pm & 6 am. However, should the need arise, staff will be paid for hours worked during the night. These hours are to be documented on the Direct Care Staff-Night Time Hour Log.**

# EXHIBIT E

Agreement on Hours Worked

This is an agreement between Five Oaks Achievement Center, LLC. hereinafter "Employer," and _____, hereinafter "Employee." Employee is employed as a Direct Care Staff Member, and is assigned to work shifts of 96 hours. Employee acknowledges that he/she is provided with sleeping facilities adequate to get a good night's sleep. Employee and Employer therefore agree that the hours of 10 PM to 6 AM will be designated as a sleeping period, and if Employee is not interrupted during this sleeping period, 8 hours will be deducted from the Employee's total number of hours worked on that shift.

If on a particular night the Employee is interrupted by a call to duty during the sleeping period, the elapsed time of the interruption will be counted as compensable hours of work, that employee must document on their time sheet.

NOTE: Employment at Five Oaks Achievement Center, LLC. is "at-will." This means that the employment relationship is for no set term, and either the employer or the employee may terminate the employment relationship at any time for any reason. Nothing in this Agreement on Hours Worked alters or is intended to alter the "at-will" nature of Employee's employment.

_____            _____

Employer                    Date                    Employee                    Date

**Paid Time Off**

Paid time off, such as holiday, vacation, and sick pay, is counted as regular hours worked and not overtime pay.

**Workweek**

Employer designates the period Monday through Sunday as its official workweek for payroll purposes.

**Overtime (time and a half)**

Overtime is considered actual hours worked after 40 hours within a workweek Monday through Sunday. Overtime is calculated by base pay and half of base pay multiplied by total number of hours actually worked over 40.

# EXHIBIT F

# Bill

Five Oaks Achievement Center, LLC.
5620 FM 359
Richmond, TX 77406

| Date | Ref. No. |
|------|----------|
| 10/01/2008 | 11343 |

| Vendor |
|--------|
| Law Office of Brian T. Farrington<br>P.O. Box 330088<br>Fort Worth, TX 76163 |



| Bill Due | 10/11/2008 |
|----------|------------|
| Terms | |
| Memo | 11343 |

# Expenses

| Account | Memo | Amount | Customer:Job | Class |
|---------|------|--------|--------------|-------|
| Legal Fees | Regarding payroll | 1,856.00 | | |

Expense Total : 1,856.00

## Bill Total :        $1,856.00

10/6/2008

Law Office of Brian T. Farrington                                                    **1,856.00

One Thousand Eight Hundred Fifty-Six and 00/100****************************************************************

Law Office of Brian T. Farrington
P.O. Box 330088
Fort Worth, TX 76163

11343

| | | | | | | 10/6/2008 | |
| Law Office of Brian T. Farrington | | | | | | | |
| Date | Type | Reference | | Original Amt. | Balance Due | Discount | Payment |
| 10/1/2008 | Bill | 11343 | | 1,856.00 | 1,856.00 | | 1,856.00 |
| | | | | | | Check Amount | 1,856.00 |

Industry State Bank -    11343                                                            1,856.00

| | | | | | | 10/6/2008 | |
| Law Office of Brian T. Farrington | | | | | | | |
| Date | Type | Reference | | Original Amt. | Balance Due | Discount | Payment |
| 10/1/2008 | Bill | 11343 | | 1,856.00 | 1,856.00 | | 1,856.00 |
| | | | | | | Check Amount | 1,856.00 |

Industry State Bank -    11343                                                            1,856.00